ARTHUR. (BUTTERFIELD v.)     See Case No. 2,249.

---

## Case No. 564.

### ARTHUR et al. v. The CASSIUS.

[2 Story, 81.] [1]

Circuit Court, D. Massachusetts.    Oct. Term, 1841.

SHIPPING—CHARTER PARTY — LIABILITY OF OWN-ERS — REFUSAL TO ACCEPT GOODS — FREIGHT—MEASURE OF DAMAGES.

1. Where the schooner Cassius was chartered to the master, as owner, for a certain voyage, and by the terms of the charter-party, the general owners were to share the freight with the master,—it was *held*, that the general owners were directly liable, as owners, for the voyage; and that the claim of the shippers for damages was not restricted to the master personally, although their agreement was made solely with him.

[Cited in Skolfield v. Potter, Case No. 12,925; Webb v. Peirce, Id. 17,320; The Freeman v. Buckingham, 18 How. (59 U. S.) 190; Thomas v. Osborn, 19 How. (60 U. S.) 40; Harney v. The Sidney L. Wright, Case No. 6,082a; The International, 30 Fed. 377.]

2. Where, also, the master was, by his agreement with the shippers, to deliver the cargo at Velasco, but upon his arriving there, the consignee refused to receive it,—it was *held*, that, as the cargo was not of a perishable nature, the master was bound to land it at Velasco, and store it for the benefit of the shippers, and could not carry it to another port, nor sell it; although it could not be sold at Velasco.

3. So, also, where freight was payable "on delivery of the cargo at the port of Velasco,"—it was *held*, that until such a delivery, no freight could accrue; and that the master should have landed the cargo, and secured his lien for freight by placing it in the hands of his agent for the benefit of the owners, but subject to the freight.

[Cited in Cargo of Salt, Case No. 2,406; The Maria White, Id. 9,083; Fox v. Holt, Id. 5,012; Irzo v. Perkins, 10 Fed. 780.]

4. But as the master had carried the cargo to New Orleans, and sold it, it was *held*, that the libellants were entitled to receive the actual value of the cargo at Velasco at the time when the same might have been there landed, deducting all duties and charges, and the freight for the voyage, as if the cargo had been duly landed.

[Cited in The Joshua Barker, Case No. 7,547; The Freeman v. Buckingham, 18 How. (59 U. S.) 190; The Maria White, Case No. 9,-083; The Boston. Id. 1,671; Hatton v. The Melita, Id. 6,218.]

5. The rule of damages in prize cases ordinarily supposes, that the vessel has been captured before she has arrived at the port of destination, and the court, in odium spoliatoris,. will presume the cargo to be worth more at the port of destination than the prime cost by 10 per cent. But to cases where the vessel has arrived at the port of destination this rule does not apply.

[6. Cited in New Jersey Steam Nav. Co. v. Merchants' Bank, 6 How. (47 U. S.) 436, to the point that proceedings in admiralty may be prosecuted for marine torts in rem and in personam. Cited in The Clatsop Chief, 8 Fed. 164, to this same point.]

In admiralty. Libel [by Isaac W. Arthur and others] on a charter-party, in rem against the schooner, and in personam against the master. The libel, in substance, stated:—1st. That Simon E. Cottrell, master of the schooner Cassius, on the third day of October, 1838, by a certain charter-party of affreightment at New York, annexed to the libel, made and concluded between him and the libellant, engaged to take and receive on board the said schooner a cargo of white pine and hemlock, and lumber, both under and on deck, and all such lawful goods and merchandise as the libellants might think proper to ship, and transport the same from said New York to the port of Velasco, in Texas, by the way of Kingston on the North river. 2d. That it was engaged,. among other things, that the libellants should pay to the said Cottrell for the freight or charter of the said vessel at the rate of fifteen dollars for each thousand feet of inch board measure on delivery at the port of Velasco, in conformity with the bills of lading, with five per cent. primage, such payment to be made in the manner specified in the said charter-party. It was also agreed, among other things, that no freight should be paid on such part of the cargo, if any, as might be lost in rafting the same on shore. 3d. That on the 17th of October. 1838, in pursuance of the said contract, the libellants delivered and shipped on board the Cassius, the following goods and merchandise:—47,755 feet hemlock and pine lumber; 29,836 feet hemlock boards, siding, &c.; 9 boxes doors, door-casings, &c.; 10 boxes window glass; 1 box books, stationery, &c.; 1 Franklin stove; 1 box stove; 43. pounds of pipe; 3 boxes paste blacking; all of great value, to wit, of the value of $1,561, for which the said Cottrell signed four bills of lading, in the usual form, stipulating to deliver the same to one Morgan L. Smith,. upon payment of freight, according to the said charter-party, with primage and average. 4th. That soon afterwards the vessel set sail, and arrived at Velasco on the 9th. day of November, 1838. and that the said Cottrell did not deliver the said cargo to the said Smith, but set sail and went to New Orleans, and there sold it, and received the proceeds, and still retains the same. 5th. That the libellants have always well and truly performed their covenants and undertakings, but that the said Cottrell has not,. by not delivering the said cargo to the said Smith. 6th. That, by reason of such non-

[1][Reported by William W. Story, Esq.]

delivery, the libellants have lost not only all the profits, which they would have received, if the said cargo had been delivered, but also the whole value of the said cargo; and that the said Cottrell wholly refuses to pay them the amount of their damages, or the value of the cargo, or the proceeds of its sale in New Orleans. and that their damages amount to a large sum of money, to wit, $3,000. Whereupon the libellants pray, that process may issue against the said vessel, and that the said Cottrell and all other persons interested be cited to appear, and that the court will pronounce the damages aforesaid, and decree such other relief to the libellants as shall to law and justice appertain, and condemn the said vessel and all persons intervening, in costs.

The answer of the master stated, as follows: 1st. That the respondent was authorized by the owners of the schooner Cassius, and had made an agreement with the said owners, to victual and man the said schooner, and to receive for compensation therefor, and for his own services as master, one half the freight earned by the schooner, and the other half to be paid to the said owners. 2d. The respondent admitting the several matters in the first, second and third articles of the libel to be true, except the valuation of the goods, farther alleges, that the Cassius set sail and arrived at Velasco on the 9th day of November, 1838. as set forth, and that upon her arrival, the said Morgan L. Smith, consignee of the cargo, came on board with a pilot, and instructed the respondent to raft the said lumber ashore, as the said pilot should direct, and that the said pilot thereafter directed the mode in which the said lumber should be rafted ashore, and about twelve thousand feet of lumber were made into a raft and towed ashore, as nearly as practicable, pursuant to his directions, and then left to drift ashore; and that the same raft was safely landed, and was hauled out of the water by men in the employ of the said Smith, who was himself present. That afterwards, before any more could be so rafted ashore, the said Smith gave notice that he would receive no more of the lumber, and would not pay any freight thereon in case it should be landed, and advised the respondent to throw it overboard, as, in that case, he could call on the underwriters, he being fully insured, and the respondent could also receive from the underwriters the amount of his freight; and that the said Smith asserted to the respondent that there was not money enough in Velasco to pay the freight for the said cargo; and that the winds and weather were as favorable for landing the remainder of the said lumber as they were when the raft was landed; and that the said Velasco is a small and poor place, containing not more than twenty-eight houses, and not more than one hundred and twenty-six inhabitants, and that there was no mar-

ket at Velasco for the said lumber, and that the same could not have been there sold for sufficient to pay the freight agreed upon by the charter-party; whereupon the respondent set sail for New Orleans, that being deemed to be the best port to make with such a cargo, with the residue of the cargo on board, and there sold the same, and the net proceeds of the sale amounted to $1,277.16. 3d. That the respondent has well and truly performed his covenants and undertakings, inasmuch as he had no means in his power to compel the said Smith to receive the said cargo, and to pay the freight thereon, and was not bound to part with the possession of the said cargo, until the said freight was paid; and the respondent avers that he was ready and willing, and offered to deliver the said cargo according to the terms of the charter-party; but that the said Smith would not receive it, nor pay freight, and, therefore, that the libellants did not well and truly perform their covenants and agreements in the said charter-party, and in consequence thereof, the respondent was compelled to convey the cargo to New Orleans, and there to sell it. 4th. The said respondent denies, that the libellants have lost any profits upon the said lumber, and avers, that it could not have been sold at Velasco for enough to pay the freight, and the respondent claims, to be paid by the libellants, the amount of freight according to the term of the charter-party, to wit. $1291.50, and the farther sum of $800 for the detention and delay at Velasco, and for transporting the cargo to New Orleans, and he claims to hold the whole proceeds of the sale of the said lumber at New Orleans, to pay the sum due to him from the libellants; and he prays the honorable court to decree, that the balance remaining due to him from the libellants, shall be by them paid to him; and he denies that the libellants have suffered any damages. Wherefore he prays the court to pronounce against the libel and condemn the libellants in costs. The answer was subsequently amended, by stating, that the box of books and stationery, and the three boxes of paste blacking, were not sold with the cargo at New Orleans, but were sent to the said Smith by the schooner William Bryant, from New Orleans, and the stoves and pipe were not sold, and that their value when taken on board at New York, was about twelve dollars, and that in addition to the proceeds of the said sale, the said stoves and pipes are insufficient to pay to the respondent the amount due to him, and, therefore. he claims to hold them.

The answer of the owners corresponded in substance to the answer of the master, and stated, that by the agreement existing between them and the said master, the said master was owner, for the voyage, of the said schooner, and as such owner solely responsible for all contracts relative to the same, and that the owners are not liable for any

default, neglect, or other liability of the said master in relation to the said voyage; that the owners never received any account from the said Cottrell, nor from any other person during the time in which the schooner was performing her said voyage to Velasco, any more than the sum of $638.58, except that they received from the said Cottrell the said stoves and pipes, and that they, the owners, insist that they are entitled to the said sum, and the said stoves and pipes, as having been paid and delivered by the master under his contract with them.

There was evidence tending to show, that the consignee, subsequently to his refusal, offered to receive the cargo.

At the hearing in the district court, there was a decree dismissing the libel, and from that decree an appeal was brought to this court.

The cause was argued by F. C. Loring, for libellants, and by William Gray, for respondents.

For the libellants, it was contended as follows: The matters put in issue by the pleadings are, 1st, the cause of the departure from Velasco; 2d, its sufficiency in point of law, to excuse the departure.

The respondents allege, 1st, that the consignee refused to receive the cargo at Velasco; 2d, that it could not be sold there for enough to pay the freight; and then argue that the master was justified in taking the cargo to New Orleans, and selling it there, and has the right to retain the proceeds in payment of the freight stipulated to be paid on the delivery at Velasco.

The libellants deny both the fact and the law. The alleged refusal of the consignee to receive the cargo, is relied upon as the main ground of defence. The proof of this is drawn from an abandonment made by him to the insurers on the cargo, on account of the unfortunate result of an attempt to land a part of it, and the state of the weather, and from some testimony, as to a refusal by the consignee to pay the freight. The abandonment was a matter between the shippers and insurers, which did not in any wise affect the master, nor discharge him from his contract to land the cargo according to the charter-party. The testimony as to the refusal to pay the freight is by no means satisfactory or unequivocal, and is entitled to little weight. But however this may be, it is fully proved, that afterwards, the consignee urged the master to wait for a favorable opportunity and land the cargo, and promised to pay the freight if landed according to the charter. If there had been a refusal, it was fully retracted, and the parties stood as if none had been made. But if the consignee did refuse, the question remains whether the master was thereby justified in leaving the port, taking the cargo to another port and selling it. By the maritime law, the shippers are bound to pay the freight.

The consignee is not, unless he receive the goods.

The master is bound to carry and deliver the cargo, unless prevented by perils of the seas. He is a mere carrier, having no interest in the cargo, or the result of the adventure; if it arrive at a poor market, it does not diminish his freight. By the charter-party, the owners, not the consignee, were to pay the freight: he therefore did not look to the cargo, and had not even a lien upon it for the freight. His duty was simply to deliver the cargo according to his contract, and look to the charterers for the freight. If after the delivery the consignee had refused to give the stipulated bills on the charterers for the freight, he might perhaps have had the right to sell enough to pay it: at any rate, he would have earned his freight; and if the consignee had then refused to receive the cargo, the loss would have fallen on the owners, and not on the master. Marine Ordinances, bk. 3, tit. 3, § 517; Chickering v. Fowler, 4 Pick. 372; Story, Bailm. pp. 340–350. As to the allegation, that the cargo, if landed, could not have been sold for enough to pay the freight: the fact, if proved, would be wholly immaterial, especially as the freight was payable in New York, and could not be affected by the state of the market at Velasco: but the evidence shows, that if landed in good order, it could have been sold at a large profit, and for much more than the freight. The testimony to the contrary comes from persons who evidently have no knowledge as to this matter. This is the defence set up in the answer; but there is a fact in the case, not stated in the answer, which explains the conduct of the master in going to New Orleans, and clears up the mystery which otherwise overhangs the proceedings at Velasco. It appears, from the testimony of various witnesses, and also from the protests made by him, that he was alarmed for the safety of his vessel, while lying off Velasco; that he considered her to be in a dangerous situation, and did not deem it prudent to remain there longer. There can be no doubt, on the evidence, that this was the true cause for the departure; and none but that this fear was without just cause; and that, if the vessel were seaworthy, it would have been perfectly safe and prudent to have remained, until a favorable opportunity should occur to land the cargo. It was not the alleged refusal of the consignee to receive the cargo, nor the state of the market at Velasco, but an unfounded fear for the safety of his vessel, which induced him to go to New Orleans, against the remonstrance of the consignee. And if this be proved, there can be no question as to the liability of the owners to indemnify the shippers for the loss occasioned thereby. As to damages, the authorities seem to establish the rule, that where the cargo has not been delivered at the port of destination, the amount to be recovered shall be the value at

the time and place of shipment, with the addition of ten per centum and interest. The Lively, [Case No. 8,403;] Wheelwright v. Beers, 2 Hall, 391; The Amiable Nancy, 3 Wheat. [16 U. S.] 546; Smith v. Richardson, 3 Caines, 319; Bridge v. Austin, 4 Mass. 115; Dusar v. Murgatroyd, [Case No. 4,199;] Gilpins v. Conseequa, [Id. 5,452;] Willings v. Same, [Id. 17,766;] Youqua v. Nixon, [Id. 18,189;] The Lucy, 3 C. Rob. Adm. 208. No deduction is to be made for freight, as the cargo was not delivered according to the charter-party. Lawes, Charter Parties, 148; Abb. Shipp. 273. Delivery precedes the right to demand freight. Logs of Mahogany, [Case No. 2,559.] No pro rata freight was earned; the libellants derived no benefit from the carriage to New Orleans, and none can be claimed for the raft landed, because it does not appear that it was landed according to the charter-party, nor in good order, nor how much was landed, and because the contract was to deliver the whole and not a part.

For the respondents, it was contended as follows: The charter-party was merely a personal contract between Simon G. Cottrell and the shippers, and no liability attaches to the owners of the schooner. Cottrell was the owner for the voyage. Taggard v. Loring, 16 Mass. 336; Abb. Shipp. (Ed. 1829,) p. 22. And as such, neither the general owner nor the vessel is liable for his acts. We concede, as a general proposition, that the ship is bound to merchandise, and merchandise to the ship. Abb. Shipp. 93; Volunteer and Cargo, [Case No. 16,991.] But we contend that this principle does not extend to cases where the general owner is not the owner for the voyage. It is well settled that a lien on a cargo for freight may be displaced by particular circumstances, which denote a clear and determinate abandonment. Logs of Mahogany, [Id. 2,559.] If, therefore, a lien for freight may be displaced, so may a lien upon the vessel; and we take the position that where the owner of the voyage is distinct from the general owner, the lien is displaced. If the owners have made a special contract for the employment of a ship, as was the case here, the master cannot substitute another contract. Abb. Shipp. 99. The owner is not liable for goods clandestinely taken on board. Walter v. Brewer, 11 Mass. 99. In Kleine v. Catara, [Case No. 7,869,] the court say, that where the charterer becomes owner for the voyage, there is no lien of the general owner for freight. It is confined to cases where the carrier for freight is .the owner for the voyage. The rights are reciprocal; if the general owner has merely a personal action, the shipper should have no more. Now Cottrell was the owner, and the general owners never received more than $638.58, and the stoves and pipe, valued at $12; and yet it is sought to make them responsible for the whole. If, however, the court is of opinion that the owners of this

vessel are liable, then we come to the merits. The making of the charter-party, loading the vessel, and arrival at Velasco, are not disputed. The libellants' ground of action is upon non-delivery at Velasco, going to New Orleans, selling cargo, and retaining proceeds. The non-delivery, sale, &c., are admitted; but the reasons assigned for this course constitute the defence. These are, 1st. That the consignee, who was owner, or agent for the owners, refused to receive the cargo, and to pay the freight according to the charter-party. 2. That the cargo could not have been sold at Velasco for enough to pay freight.

What, then, are the principles of law which govern such a case? The master has a lien upon a cargo for freight, and is not bound to part with the cargo until the freight is paid. Abb. Shipp. 247, 273; Bradstreet v. Baldwin, 11 Mass. 229. An express contract is no waiver of lien. Peyroux v. Howard, 7 Pet. [32 U. S.] 324. Volunteer and Cargo, [Case No. 16,991.] It cannot be denied, that he has such lien upon the cargo, and, as a necessary result, has the right to retain it. If, therefore, the master forward goods, or be prevented or discharged from so doing, he is entitled to his whole freight. Hunter v. Prinsep, 10 East, 394. If the consignee refuse to receive the cargo, the master may, by authority of a magistrate, sell a part for payment of his freight, and deposit the rest in a warehouse. Valin, Ord. Mar. bk. 3, tit. 3, art. 17. The voyage being performed, and the master ready to deliver the cargo, he is entitled to freight. [Griswold v. Insurance Co.,] 1 Johns. 213; [Ludlow v. Bowne,] Id. 14; [M'Kinstry v. Pearsall,] 3 Johns. 319; [Mayell v. Potter,] 2 Johns. Cas. 371; Abb. Shipp. note, pp. 288, 298; Morgan v. Insurance Co. of North America, 4 Dall. [4 U. S.] 455. If it could not be sold, he would have a right to carry it to the nearest and most convenient port. But if the cargo could have been sold at Velasco for enough to pay freight, yet, after the refusal of the consignee to accept, the master became agent for the owners of cargo; and the owners of the vessel are not responsible for his acts in that capacity. Then if the master had no right to go to New Orleans, we say, that after the cargo was carried to Velasco, and the consignee refused to receive it, the master thereupon became the agent of the shippers, and his acts in that capacity cannot affect the owners. The Sarah Ann, [Case No. 12,342;] The Gratitudine, 3 C. Rob. Adm. 240; 1 Phil. Ins. 192; Stocker v. Harris, 3 Mass. 417; 1 Phil. Ins. 471; Waldens v. Phoenix Ins. Co., 5 Johns. 324, 325; Young v. Smith, 3 Dana, 92. If the consignee refuse to receive the cargo, the master must act as agent for the owners; that is, he alone is accountable to them. It may become important to consider where is the burden of proof; and, in such case, if we show a refusal to receive and pay freight,

and the libellants rely upon a waiver, they take the onus.

[Before STORY, Circuit Justice, and SPRAGUE, District Judge.]

STORY, Circuit Justice. This cause has been very fully argued upon the appeal. The merits of the whole controversy mainly turn upon the following points. 1. Whether there was in fact a final refusal on the part of the consignee at Velasco to receive the goods there. 2. If there was, whether the master had a right, under all the circumstances, to carry the same to New Orleans, and there to make sale of them on account of the shippers. 3. If the respondents fail, on these points, to make out a satisfactory defence in proof, whether, as owners of the Cassius, they are responsible for damages to the libellants. 4. If they are so liable, what should be the rule and measure of the damages.

In respect to the liability of the owners of the Cassius, (who have intervened for their own interest,) in this suit, I have no difficulty. The charter-party is in no just sense a mere personal contract of the master. It contains an express stipulation, pledging not only the personal security of the master, but also the Cassius and her freight and appurtenances, for the due fulfilment of the covenants of the charter-party on his side. Now, if the master was, as the owners of the Cassius by their answer assert, owner for the voyage, under a special agreement with them, I do not perceive why he is not to be deemed so for all purposes whatsoever, and to have a perfect right as such owner to pledge the Cassius for the due fulfilment of the charter-party. If, on the other hand, the general owners were owners for the voyage, as I am of opinion upon their own statement of their agreement with the master, they ought to be held to be, then the Cassius is liable upon the charter-party, which is not denied to have been only authorized to be made for the voyage therein stated. What was that agreement, as stated in the answers both of the master and the owners? That the master "should employ and navigate the Cassius, and victual and man her, and should be entitled to retain as his compensation therefor, and for his own services as master, one half of the freight, which should be earned by the Cassius, and he was to pay the other half of the freight to the owners of the said schooner." The owners, then, were, upon acknowledged principles of law, jointly interested with the master in the freight; and jointly responsible with the master to the shippers, as partners or part owners in the freight and profits of the voyage (the gross freight); or he was to receive the half freight in lieu of and as a compensation for his services as master, and then the owners were directly liable as owners for the voyage, as well as general owners. In either view, the case would fall within the principles applicable to the jurisdiction of courts of admiralty by proceedings in rem upon charter parties, which were recognized in the case of The Volunteer, [Case No. 16,991, with which I have not since seen any reason to be dissatisfied. The case of Taggard v Loring, 16 Mass. 336, has been cited at the bar as establishing, that the master was owner for the voyage. That case is distinguishable in its actual circumstances from the present. The agreement in that case does not appear from the statements of the Report to have been identical with the present. And if it were, I must say, that I should have some difficulty in acceding to the authority of that case, if it meant to establish, that the master had an exclusive special ownership in the ship for the voyage. I should rather incline to the opinion, that if he had any ownership at all for the voyage, it was in common with the general owners. In the present case there does not appear to be any distinct proof of what the agreement between the owners and master was. None is produced in writing, and none is established in the testimony. It rests wholly upon the answers of the owners and master, whose statements on such a point, even if responsive to the allegations of the libel, (which they are not,) would not of themselves, in a court of admiralty, be satisfactory evidence. Besides, there is this additional consideration, that the charter-party, in this very case, was executed by the master in his character as master, and not as charterer and owner for the voyage. The respondents have admitted, in effect, that he was entitled to make the charter-party; and they held him out to the public, from the nature of this employment as a freighting vessel, as having general authority to bind the owners on a freighting voyage. The secret agreement, therefore, between the master and the owners, as to the shares of the freight between them, or the rights of the master in the navigation and control of the vessel, cannot, as they were not made known to the charterers, bind them, or vary their rights against the general owners. This objection, therefore, in every view is unmaintainable.

Then as to the merits of the case. In the first place, was there any absolute, positive, and final refusal of the consignee to receive the cargo? There certainly is something in the conduct and management both of the master and the consignee in respect to their proceedings at the port of Velasco, which is exceedingly suspicious and mysterious, not to say, which gives rise to great doubts, whether there was not some connivance between them for purposes adverse to the interests of the charterers, on whose account the shipment was made. It has been suggested at the argument, that the consignee was, or at least might fairly be presumed to be, the real owner of the shipment. I see no sufficient foundation for such a suggestion in the facts of the case. It is repugnant to the apparent objects and intentions of the

charter-party; and if the consignee had been the intended shipper in the original enterprise, it is inconceivable, why he was not made a direct party to the charter-party. His conduct at Velasco, while it may furnish some reason to doubt (if the evidence is believed) his good faith to the charterers and shippers, cannot be admitted to control their rights or change their property without their knowledge and adoption of all his conduct. It is said, that he might have been made a witness in the cause on the part of the libellants. Perhaps he might, but certainly not without a release, which, if he has sacrificed their interests, they would be very unwise to give. On the other hand, the respondents could have used him as a witness without a release; and if they meant to rely upon his being the owner of the shipment, it was their own fault not to take it, or to exhibit other proofs of the fact, since it is properly a matter of defence to the suit.

The conduct of the master in signing two protests, each of which was false in its statements, as he in his answer on oath now admits, is utterly without excuse. It was done in connivance with the consignee, under the pretence on his side, (as his letter to the master shows), that the landing of the cargo was either impracticable, or so dangerous and expensive, that the whole might be abandoned to the underwriters, and thus the loss thrown on them; when in point of fact, as all the evidence now in the case conclusively shows, the landing might have been effected without danger or difficulty. These protests were drawn up and signed by the master for the purpose of giving this very gloss to the transaction. Neither of these protests alludes in the slightest manner to the refusal of the consignee to receive the cargo. On the contrary, both of these protests, as well as the letter of the consignee, put the case upon the other ground. But I cannot but entertain some suspicion, founded upon the positive evidence in the case, that another motive had its operation upon the mind of the consignee, that is, a desire to have the cargo landed and sold by the master at auction on account of the underwriters, so that it might be bought in at a low price for his own benefit. Be this as it may, for such has been the conduct of these parties that I cannot judicially repose confidence in their acts or statements, if Capt. Hendley is to be believed (and I do not well know what reason to assign why he should not) it is certain that the consignee did subsequently offer to receive the cargo and comply with the charter-party, nay, did require that the cargo should be landed, and the master refused to land it, alleging the dangerous situation of his vessel and the extreme difficulty, if not impracticability, of so doing. Now, even if the consignee did at first refuse to receive the cargo; yet, if before the departure of the Cassius from the port he was willing and ready to receive it,

it was the duty of the master to proceed and land it. If he could have landed it (of which there is now no doubt) and he did not, it was a plain breach of the contract. It was an idle pretence to suggest that the cargo could not be sold at Velasco for the want of sufficient money to be had to pay for the same. That was nothing to the master. The freight was not payable in money at Velasco, but was payable by a bill to be drawn by the consignee on New York. It was, therefore, wholly immaterial to the master whether the cargo could be sold at Velasco or not. In this view of the case there was a clear breach of the charter-party by the master, in the non-delivery of the cargo at Velasco.

But, suppose, in the next place, there was a final refusal to receive the cargo by the consignee, did that authorize the master to carry it to New Orleans? The learned counsel for the respondents has insisted, at the argument, that it did. I agree, that in cases of necessity, the master becomes, by mere intendment and authority of law, the agent of all concerned, as well of the owners of the cargo, as of the ship—ut res magis valeat quam pereat. But this right of the master is to be clearly made out by unquestionable proof of such necessity. In the present case, the cargo could have been landed at Velasco, which was the port of destination. Then there was no necessity of carrying it elsewhere. It is said, that it could not have been sold at Velasco, for want of money in the hands of purchasers. Be it so. But there was no necessity of any sale; the cargo was not perishable; and, therefore, the sale would have been unjustifiable on the part of the master; since it would not have been a sale of necessity. The cargo might have been landed and stored, and kept until the charterers at New York could have received information, and given orders as to what should be done with it. But it is said, that the master was not bound to give up the cargo before his freight was paid or secured according to the charter-party; and that he had a right to retain it for the lien created by law. Assuming, that such a lien existed under the terms of the present charter-party, still it is perfectly clear, by the language of the same instrument, that the freight was payable only "on delivery of the cargo at the port of Velasco," and "that no freight was to be paid on such part of the cargo, if any, as may be lost in rafting the same on shore." So that until a right delivery on shore, no freight could accrue due. If the consignee refused to receive the cargo after it was landed, and to give the bill on New York for the freight, then it became the duty of the master to place the same in the hands of some trustworthy person for the security of his lien for the freight, and, subject thereto, for the benefit and account of the owners. But no right, even under such circumstances,

could exist on the part of the master to sell the cargo, unless it was perishable, and might otherwise have been lost or have perished, which is not proved or pretended by the answer. A fortiori, if the master had no right to sell at Velasco, because there was no necessity therefor, he could not have a right to carry the cargo to New Orleans and sell it there; since it is just as clear that there was no necessity therefor. This act, therefore, in carrying it to New Orleans, was a gross breach of his duty, and the sale a tortious conversion of the property. It might, perhaps, have admitted of a very different construction, if the cargo could not have been landed at Velasco, or there deposited in safety for the owners; or if the sale at Velasco or at New Orleans had become indispensable from the perishable nature and condition thereof. Such a case has not been made out; and, therefore, it need not be decided upon the present occasion.

It appears to me, therefore, clear that the non-landing of the cargo at Velasco, and the carrying of the cargo to New Orleans, and the sale thereof in that port, are all breaches of duty on the part of the master, for which the respondents are liable.

The only remaining question is as to the rule and measure of damages. It appears to me, that, as the cargo safely arrived at Velasco, and might have been landed there, but for the misconduct of the master, the libellants are entitled to recover the actual value thereof at Velasco, at the time when the same might have been there landed, deducting all duties and charges, and the freight for the voyage, as if the cargo had been duly landed. It is said that no freight was due, because there was no delivery thereof. That is true. But still the cargo was carried there, and if it had been rightly delivered there, the freight would have constituted a charge upon the value in that port. So that, if the libellants are to take the value there, as I think is the true rule, they are to be, as to that value, in the same state and condition as if the cargo had been duly landed, and not in a better state and condition. The rule, adopted in cases of prize, of ten per cent. upon the prime cost, is not applicable to cases like the present. That rule ordinarily supposes, that the vessel has been captured, before she has arrived at the port of destination, and then the court in odium spoliatoris will presume the cargo worth more at the port of destination than the prime cost by ten per cent.; which used to be the old rule of estimating the fair and reasonable profits in ordinary cases, after deducting all charges. But where the vessel actually arrives at the port of destination, in cases like the present. the loss, if any, is susceptible of a more exact computation, by its true and real market value there.

I shall, therefore, refer it to an assessor, to ascertain the value of the cargo at Velasco, deducting the freight and duties, and all other proper charges; and the libellants will be entitled to recover the difference, as the true amount of their loss, with costs. The decree of the district court is, therefore, reversed; and the final decree will be entered according to this opinion.

As the master has died pending the proceedings, and no revivor of the suit, as to him, has been moved for, it is unnecessary to consider whether a proceeding in rem and in personam can be instituted in the admiralty in a case of this sort. The libel must be treated as defunct, so far as the master is concerned.

ARTHUR, (DAVIES v.)   See Case No. 3,611.

ARTHUR, (DODGE v.)   See Case No. 3,950.

ARTHUR, (DUDEN v.)   See Case No. 4,112.

ARTHUR, (GAUTIER v.)   See Case No. 5,278.

ARTHUR, (GODDARD v.)   See Case No. 5,489.

ARTHUR, (HAAS v.)   See Case No. 5,885.

ARTHUR, (KEYSER v.)   See Case No. 7,749.

ARTHUR, (MORRISON v.)   See Case No. 9,842.

ARTHUR, (MURRAY v.)   See Case No. 9,956.

END OF CASES IN BOOK 1.