## IRZO *v.* PERKINS and others.

*(District Court, S. D. New York.* November 14, 1881.)

1. SHIPPING—DELIVERY OF CARGO—USAGES OF PORT.

   It is the duty of the vessel to make delivery of cargo, and where the bill of lading is silent as to the particular place and mode of delivery, it must be made according to the usages and regulations of the port, or the arrangements made with the consignee.

2. DEMURRAGE.

   Where, on the arrival of a vessel, an arrangement was entered into between the ship's agent and the respondents, consignees of a part of the cargo, that the vessel should go to a particular dock, and that such part of the cargo should be delivered in lighters to be sent by the respondents to receive it, *held*, that such an arrangement, so long as it is unrevoked and is acted on by either, is binding upon the other, and as the vessel, upon the faith of such arrangement, went to the dock agreed upon and waited for lighters to be sent by the respondents, the latter are estopped to deny that the detention was by their procurement and for their benefit, and that they are liable for demurrage.

3. SAME—COSTS, WHEN NOT ALLOWED.

   Where the claim of the libellant was in part upon a basis not sustained, and another portion of it was abandoned, costs were not allowed.

In Admiralty.

*Beebe, Wilcox & Hobbs,* for libellant.

*Olin, Rives & Montgomery,* for respondents.

BROWN, D. J. This is a libel *in personam* to recover damages in the nature of demurrage for the detention of the bark Roma in the delivery of 300 tons of iron consigned to the respondents at this port.

The iron was shipped at Marseilles, under the usual bill of lading, to be delivered to the respondents on payment of freight, with no special clause in reference to demurrage or mode of delivery. The cargo of the Roma was a mixed cargo, consigned to six different consignees. The portion consigned to the respondents was in the bottom of the hold. It was the greatest in weight, but not in bulk, of any of the different consignments, though it formed less than a major part of the cargo.

It appeared in evidence that there are but comparatively few wharves at this port where large quantities of iron will be received, for want of sufficient strength and solidity to bear its great weight, and that for this reason, as well as for greater economy in handling, iron is very frequently unladen in lighters. The Roma arrived in the lower bay on the tenth of November, 1879. On the same day the agent of the vessel called on the respondents, and inquired if they were going to take their iron on lighters, telling them, at the same time, that the other consignees had consented to the vessel going to the Atlantic dock, and asking if they had any objections. The respondent's ship-

ping clerk replied that they were going to take their iron on lighters; that that dock would suit them; and inquired when the vessel would be ready for the lighters, and was told in four or five days. The vessel thereupon went to the Atlantic dock, and by the 18th or 19th was ready to discharge the iron; but owing to great difficulty in procuring lighters at that time none was sent to receive it until the 26th, when one lighter was sent alongside and received about half the iron. On December 1st a berth for the vessel was obtained by the respondents at Merchants' Stores, to which the vessel was removed, and the rest of the iron was discharged there upon the wharf by December 6th. Four days were admitted to be a reasonable time for discharging the iron. The freight was paid December 8th, leaving the claim for demurrage, which had previously been rendered, unadjusted. This libel was thereafter filed on December 19, 1879, claiming 14 days' demurrage, viz., from the nineteenth of November to December 6th, less four days for delivery, and also claiming $630 special damages for loss of more favorable return freights, which it is alleged the vessel would have obtained but for this detention.

It is the duty of the vessel to make delivery of the cargo. If the consignee will not receive it she must unlade it where she can, and store it suitably for the shipper's account. *Kennedy* v. *Dodge*, 1 Ben. 311; *Vose* v. *Allen*, 3 Blatchf. 289; *The Eddy*, 5 Wall. 481; *Arthur* v. *Schooner Cassius*, 2 Story, 81; *Ostrander* v. *Brown*, 15 Johns. 39; 1 Pars. Shipp. & Adm. 225; *Brittan* v. *Barnaby*, 21 How. 527.

Where, as in this case, the bill of lading is silent as to the particular place or mode of delivery, it must be made according to the usages and regulations of the port, or the arrangements made with the consignee. It is competent for the ship's agent to make such arrangements with the consignee, and any specific agreement so made by him in regard to the delivery will bind the ship. *The Grafton*, 1 Blatchf. 173.

The libellant sought to prove an established custom and usage at this port making it the duty of the consignee of iron, though it constituted but a minor part of the cargo, to provide a berth where the vessel could unlade it; and when a berth was so provided, that the ship was bound to go there to unload, although the rest of the cargo might be discharging elsewhere. Several witnesses testified with more or less distinctness to this custom; but it was denied by others having nearly equal opportunities of knowledge. As the force of such a custom depends upon the general knowledge of it and acquaintance in it, I must find, upon testimony so conflicting, that the alleged custom is not proved, although there is stronger support for such a usage in the case of the consignment of a whole cargo of iron to a single consignee.

I cannot doubt that at the interview between the agent of the Roma and the shipping clerk of the respondents, on the tenth of November, a complete understanding for the time being was had for the delivery of the iron at the Atlantic dock in lighters, to be sent by the respondents to receive it. The conversation then had was not, it is true, in form, a specific contract, like that in the case of *The Grafton*, 1 Blatchf. 173. They did not agree that the iron should absolutely and at all events be delivered into lighters and not otherwise. But both parties must have been aware of the difficulty in procuring a berth for unloading iron upon a wharf, as well as the greater economy of unloading in lighters; and when unloading on a wharf was first spoken of, the greater cost of doing so was a matter of objection by the respondents. The inquiry by the ship's agent on the tenth of November, before the ship had gone to a berth, was obviously in reference to these facts; and in answer to his inquiries it was expressly stated by the respondents that they would take the iron on lighters. The Atlantic dock was agreed upon as the place, and the time when the lighters were to be sent was approximately fixed. Both parties acquiesced in this arrangement. It was calculated to influence, and was manifestly designed to influence, the action of both parties in reference to the place and mode of delivery of the iron; and both parties immediately acted upon it,—the ship in going to the Atlantic dock, and in waiting for the lighters where she could not put iron on the wharf; and the respondents in taking steps with more or less diligence to get lighters, one of which was finally sent on the 26th. Such an arrangement, so long as it is unrevoked and is acted on by either, is, *ex æquo et bono*, binding upon the other. Had the respondents procured and sent lighters at the time specified, and found the iron already put upon some wharf elsewhere, without previous notice to the respondents, the ship must have been held answerable for the damages to the respondents, if any, in obtaining lighters upon the faith of the previous arrangement. And as the Roma, upon the faith of the same arrangement, went to a dock where iron could not be put upon the wharf, and waited for lighters to be sent by the respondents, the latter are estopped from denying that the detention of the ship was by their procurement and for their benefit.

In such cases the consignees must be held liable for demurrage *in personam*, notwithstanding the payment of freight, as much as the shippers would have been held upon any arrangement of their own in respect to the delivery. *Donaldson* v. *McDowell*, 1 Holmes, 290; *Stafford* v. *Watson*, 1 Biss. 437.

The respondents must, therefore, be held answerable for the damages to the libellant, so long as he acted upon and was legally justified in acting upon this arrangement. This continued until the ship's agent was notified by the respondents to put the iron upon the wharf, and if it would not be received at the Atlantic dock to put it upon any other wharf where the ship could find a berth therefor. This was a revocation and abandonment by the respondents of the previous arrangement, leaving them answerable for the damages incurred by the Roma up to that time. Thenceforward the Roma was remitted to her original obligation to find her own berth for the delivery of the iron, in the absence of sufficient proof of any usage to exempt her from that duty.

Most of the subsequent detention arose from the claim of the ship's agent that the consignees were bound to provide a berth, doing nothing himself to that end during the pendency of the dispute on that subject. The fact that on December 1st a berth for the delivery of the rest of the iron upon a wharf was procured by the respondents, cannot be suffered to prejudice their legal rights, nor be taken as any evidence whatever as against them of any legal obligation on their part to provide a berth, as this obligation was all the while clearly and unequivocally denied by them. It would be not only unjust, but in the highest degree impolitic, in cases of disputed obligations, to suffer the voluntary efforts of either party, in terminating a dispute and stopping the increase of damages, to be turned against them in any subsequent litigation. Such efforts ought, on the contrary, to be commended by the court as making for peace, and as evidences of an unlitigious *animus*.

The precise date when the respondents gave notice to the ship's agent to put the iron wherever he could find a wharf to receive it, does not very clearly appear. It was before the lighter was sent, and after complaints of the delay had been made, and, as near as I can make out from the evidence, was about November 24th. As the vessel was ready to deliver by the 19th, and as ample notice had been previously given the respondents to be in readiness by that date, the respondents must answer for those five days' delay; and, as there is no reason to doubt that a berth for the delivery of the iron at the wharf could have been obtained at first, as well as on December 1st, or that the vessel would have gone there but for the arrangement made for delivering on lighters, the respondents should pay for the delay and costs of removal to the second berth. No evidence of the charges so incurred was given, nor any reasons

for the ship's delay after the berth was procured on December 1st. But as some time must have been taken in such removal, I add one day's detention for this cause, making in all six days, which, at the rate of $51 per day, the rate agreed on, gives $306, with interest from December 6, 1879, for which the libellants are entitled to jûdgment; but as their claim was in part upon a basis not sustained, and another portion of it, viz., that for loss of freight, was abandoned, costs should not be allowed.

See *Reed* v. *Weld*, 6 FED. REP. 304.