HAWGOOD and others *v.* ONE THOUSAND THREE HUNDRED AND TEN TONS OF COAL.

*(District Court, E. D. Wisconsin.* June 14, 1884.

DEMURRAGE—LIEN—BILL OF LADING.

A ship-owner has a lien upon the cargo for demurrage, enforceable in the admiralty, although the bill of lading contains no demurrage clause.

In Admiralty.

*Markham & Noyes,* for libelants.

*Theodore G. Case,* for claimant.

DYER, J. On the seventeenth day of August, 1882, R. R. Hefford, as agent for Pratt, Parker & Co., shipped on board the following

named vessels, at Buffalo, certain cargoes of coal, all consigned to A. Pugh & Co., care of Green Bay, Winona & St. Paul Railroad Company, at Green Bay, Wisconsin, namely: On board the steamer Belle Cross,—which was a steam-barge engaged in towing other vessels and carrying cargoes upon the lakes,—317 net tons of Blossburgh coal; on board the sailing barge Chicago Board of Trade, 693 gross tons of chestnut coal; on board the sailing barge George H. Wand, 638 gross tons of stove coal; on board the sailing barge Little Jake, 654 net tons of stove coal; and on board the sailing barge S. Clement, 783 net tons of stove coal; of all which vessels the libelants were the owners. `Freight was to be paid at the rates of 85 cents per ton for the cargo of chestnut coal, and 90 cents per ton for all the other cargoes. The bills of lading provided that the consignee was to discharge cargoes without expense to the masters of the vessels, who were to collect the freight, but they contained no stipulation as to the time within which the cargoes were to be unloaded at their destination, nor as to the payment of demurrage in case of detentions in unloading. The vessels, sailing as a fleet, left Buffalo with their cargoes about August 17th, and arrived at Green Bay on the twenty-eighth of that month. They were there detained, in part, because of the previous arrival of other vessels awaiting discharge of cargoes, but principally for want of facilities for unloading, until the fifth of September, when the last of the fleet was unloaded. The entire cargoes were placed upon the docks of the railroad company, but a portion of the coal was unloaded under an assertion of a lien for demurrage, and a special custodian thereof was placed in charge by one of the libelants, and continued in charge until the coal was seized by the marshal upon monition issued in the present suit. The libelants' right to recover is contested upon every ground of defense set up in the answer, but the only question that will be considered in this opinion is that of the right of the libelants to maintain this suit *in rem* upon their claim for demurrage. The contention of counsel for the claimant is that in the absence of any stipulation in the bills of lading limiting the time within which the cargoes should be unloaded, or providing for the payment of demurrage in case of unreasonable detention, the libelants can assert no lien upon the cargo for loss or damage occasioned by such detention; and therefore that in such case a suit *in rem* is not maintainable in admiralty, but that the remedy of the owners of the vessels, if any, is one exclusively *in personam* against the consignee of the cargoes. From quite an early period there has been a good deal of controversy in the common-law courts, and later in some of the admiralty courts, upon the subject of the rights of ship-owners and other carriers with reference to claims for demurrage. The question seems to have most frequently come up in suits between ship-owner and consignee, and hence direct authority is not abundant upon the precise point here in judgment.

Two English cases (*Phillips* v. *Rodie*, 15 East, 547, and *Birley* v.

*Gladstone,* 3 Maule & S. 205) are much relied on in argument by counsel for the claimant, who insists that they declare to this day the law governing a case like the present. Both were common-law actions. *Phillips* v. *Rodie* was a suit in trover, brought by the assignee in bankruptcy of the charterer of a vessel and consignee of the cargo for 179 bales of cotton which were in the possession of the ship-owner, and held by him on a claim for dead freight and demurrage. It was decided that where the freighter of a ship covenanted that if she should not be fully laden he would not only pay for the goods on board, but also for so much in addition as the ship would have carried for which he had stipulated to pay freight according to different rates, the ship-owner had no lien upon the goods actually on board for the amount of the dead freight; in other words, for the compensation in damages which he was entitled to for the freighter's breach of contract in not putting a full loading on board. The ground on which the judgment of the court proceeded seems to have been that there was nothing to which a lien could attach. The claim was for freight not earned, and which it was claimed the ship-owner ought to have earned, or unliquidated compensation for the loss of freight recoverable in the absence and place of freight. Nothing was said about demurrage, apart from the question of dead freight; but, as the ship-owner's claim included demurrage, and as it was held that the plaintiff could maintain his action, it must be implied that the judgment of the court was that there was no lien upon the goods, either for dead freight or demurrage. *Birley* v. *Gladstone* was an action by the assignee of the freighter to recover money paid by him to the ship-owners under protest, which money was demanded by the ship-owners in respect of goods which were put on board the vessel at the loading port, but were afterwards relanded and restored to the agent of the freighter, under process of law, at the loading port, and for dead freight and demurrage. The action was *assumpsit.* By the charter-party the ship-owner covenanted to receive a full cargo, and the freighter to load the same, and to pay so much for every ton of freight which should be delivered at the King's beams, at Liverpool, and so much *per diem* for demurrage. The parties mutually bound themselves—the ship-owners the ship, and the freighter the goods to be laden on board—in a penal sum for the performance of every article contained in the charter-party; and it was adjudged that the ship-owners had no lien upon the goods actually brought home to Liverpool for the sum of money claimed to be due on account of goods which were put on board at the loading port, but afterwards relanded and restored to the freighter's agent, under process of law, at such port, nor for the sum claimed for dead freight and demurrage; and *Phillips* v. *Rodie* was cited in the judgment as decisive authority upon the points.

It would, perhaps, be enough to say of these cases that as they were suits at common law, requiring judgments upon the common-law

rights of the parties, they are not to be regarded as declaratory of the principles of law which now govern courts of admiralty in determining questions like the present. In this connection the remarks of Judge LOWELL in the case of *The Hyperion's Cargo*, 2 Low. 94, are very pertinent. He says:

"When the common law of England was modified by the introduction of many rules from the law-merchant, the former law had no process for enforcing this reciprocal privilege of the ship and the goods, [that is, the privilege which has its origin in the rule that the ship is bound to the merchandise and the merchandise to the ship,] and had succeeded in repressing the only court that had the requisite modes of action, and was therefore obliged to say that it could not recognize the maxim even when embodied in express contract, as it usually is in English charter-parties. *Birley* v. *Gladstone*, 3 Maule & S. 205; *Gladstone* v. *Birley*, 2 Mer. 401. From the time of those decisions to that of *Gray* v. *Carr*, L. R. 6 Q. B. 522, the history of this question in the courts of common law in England has been that of a struggle between the ship-owners to create liens by stipulation, especially liens for demurrage, and of the courts to narrow the stipulations by construction. See *Phillips* v. *Rodie*, 15 East, 547; *Faith* v. *E. I. Co.* 4 Barn. & Ald. 630; *How* v. *Kirchner*, 11 Moore, P. C. 21; *Tindal* v. *Taylor*, 4 El. & Bl. 219; *Bishop* v. *Ware*, 3 Camp. 360. In nearly all the cases the obvious intent of the parties has been disregarded, and a remedy refused for a violated right. In this country the courts of admiralty have retained their proper jurisdiction, and can enforce the privilege by whichever party this action may be invoked. *Dupont de Nemours* v. *Vance*, 19 How. 162; *The Belfast*, 7 Wall. 624; *The Maggie Hammond*, 9 Wall. 450."

And upon the point whether the privilege extends to demurrage, not expressly stipulated for in the bill of lading,—

"The cases at common law do not afford much aid, because they recognize no general responsibility of the goods to the ship, but only a right of retainer, which they say cannot be conveniently exercised in support of a demand for unliquidated damages,—a point of no consequence in the admiralty."

These remarks are applicable to the cases of *Crommelin* v. *N. Y. & H. R. R. Co.* 4 Keyes, 90, and *C. & N. W. Ry. Co.* v. *Jenkins*, 103 Ill. 588, cited on the argument. It was once held, and by some courts is yet held, that, in the absence of a stipulation in the bill of lading providing for the payment of demurrage, no claim for damages can be made. In *Jesson* v. *Solly*, 4 Taunt. 52, it was decided that if a consignee accept goods under a bill of lading, at the bottom of which is a memorandum that the ship is to be cleared in 16 days, and £8 per day demurrage be paid after that time, the master, upon delivery of the goods, may recover demurrage against the consignee. In *Brouncker* v. *Scott*, 4 Taunt. 1, which was a suit in *assumpsit* by the master of a ship upon an implied promise to pay demurrage, MANSFIELD, C. J., said:

"This form of action for demurrage, without a special contract to that effect, is not of long standing, even in the case where the owners of the ship are the plaintiffs; and, as it generates a question whether the time elapsed was a reasonable time, and also what is a reasonable compensation for the use of the ship, it would be much better if it had not been encouraged, and if the owner had always made it a subject of special contract."

See, also, *Young* v. *Moeller*, 5 El & Bl. 755, and *Kell* v. *Anderson*, 10 Mees. & W. 498.

And in *Gage* v. *Morse*, 12 Allen, 410, which was a suit at law by the owners of a vessel against the consignee named in the bill of lading for demurrage, it was held that if a bill of lading contains no provision for the payment of demurrage by the consignee, he is not liable therefor, even upon his acceptance of the cargo; citing *Jesson* v. *Solly* and *Young* v. *Moeller, supra*, and *Chappel* v. *Comfort*, 10 C. B. (N. S.) 802, and *Smith* v. *Sieveking*, 5 El. & Bl. 589. But it was held otherwise in admiralty, where the consignee was the freighter, in *Sprague* v. *West*, 1 Abb. Adm. 548, a leading case, decided by Judge BETTS, in which, upon a review of the authorities, he said:

"Courts of admiralty act upon the rights arising out of maritime transactions, without regard to modes or names of actions, and independent of all forms. The suggestion that demurrage can be claimed upon the footing of express contract alone is undoubtedly giving too narrow an effect to the term. Every improper detention of a vessel may be considered a demurrage, and compensation in that name be obtained for it. 2 Hagg. Adm. 317; *The Apollon*, 9 Wheat. 362."

In *The M. S. Bacon* v. *Transp. Co.* 3 FED. REP. 344, it was held that an express stipulation for demurrage in a contract of affreightment is not necessary to entitle the owner of a vessel to compensation for her unnecessary or improper detention in loading or unloading: "Reasonable promptitude in delivering a cargo at its point of shipment, and in receiving it at its destination, is a duty implied in such contracts; and for a violation of it, damages, in the nature of demurrage, are recoverable. This is too well-settled, both in England and in this country, to need discussion or authority."

The observations of Judge BLODGETT in *Fulton* v. *Blake*, 5 Biss. 375, 376, are also in point:

"All persons engaged in dealing with ships, whether master, crew, or consignee, are bound to give them dispatch, and whoever causes any unreasonable delay is answerable in damages. A consignee to whom the cargo of a vessel is consigned should, within the time prescribed by the usage of the port, after notice of the arrival of a vessel, furnish a suitable place for unloading or he shall pay damages for detention, whether demurrage be noted on the bill of lading or not. It may not be what is technically called demurrage in the books, but it is damages for unreasonable detention, unless the vessel has arrived so far out of her expected time as to make such prompt dispatch unreasonable." See, also, *Cross* v. *Beard*, 26 N. Y. 85.

It is thus apparent that, in the present state of decision, there is no ground for the contention, at least in a court of admiralty, that the right to maintain a claim for demurrage or damages for unreasonable detention of a vessel is dependent upon the existence of a demurrage clause in the bill of lading. That an admiralty action *in personam* will lie, in such case, against the consignee of the cargo, if he is responsible for such detention, is also beyond question, whether the bill of lading contains any stipulation on the subject or not. Why has not the ship-owner also a lien on the cargo for demurrage,

and why may not such a lien be enforced in the admiralty? Demurrage is merely an allowance or compensation for the delay or detention of a vessel. *The Appollon*, 9 Wheat. 362. It is only an extended freight or reward to the vessel in compensation of the earnings she is improperly caused to lose. *Sprague* v. *West, supra;* Holt, Rule Road, pt. 3, c. 1. Why should the right of the ship-owner be limited in the admiralty to a common-law lien, when, in fact, that right is dependent on the law-merchant, which extends the lien or privilege to all charges, damages, and expenses growing out of the affreightment? By the general maritime law, the ship is bound to the merchandise and the merchandise to the ship. It is the doctrine of the law-merchant that the master or ship-owner contracts rather with the merchandise than the shipper; and, as is remarked by Judge SHEPLEY in *Donaldson* v. *McDowell*, 1 Holmes, 290, "it necessarily follows from this that the merchandise is liable for whatever the shipper is liable." It is unimportant that a demurrage claim is unliquidated. Admiralty takes cognizance of many claims that are unliquidated, such as salvage claims, demands for injury to goods, and claims on account of non-delivery of cargo. In the present extended jurisdiction of the admiralty, and liberal recognition of the rights of parties interested in lake navigation and commerce, no sound reason is apparent why the ship-owner's privilege or lien should not be extended to demurrage. The relation of the ship to the cargo and of the cargo to the ship is reciprocal. If the ship is bound to safely deliver the cargo to the consignee, without exemption from liability, except such as may be named in the bill of lading, the cargo ought to be answerable for the neglect of the consignee to duly receive it. The cargo may be libeled for freight. Why not for the extended freight which the vessel is improperly caused to lose, where, as in this case, the consignee is the owner of the cargo? It may be libeled for general average and numerous other demands. "As in this country courts of admiralty have frequently exercised their jurisdiction to enforce the privilege where the cargo has been libeled for freight, general average, and other charges, there seems to be no just ground for making an exception and refusing a remedy for a violation of duty and right in the case of demurrage, which, under circumstances like those in the present case, is as much a charge or damage which the master may lawfully demand, and for which he has a privilege against the cargo, as the freight itself, of which demurrage is only an extension." *Donaldson* v. *McDowell, supra.* In that case, and in the case of *The Hyperion's Cargo, supra*, it was adjudged that the ship has a privilege against the cargo for demurrage or damages, in the nature of demurrage, enforceable in the admiralty, when the cargo has not been received within a reasonable time, through fault of the consignee, although the bill of lading contains no demurrage clause; and it would, undoubtedly, have been sufficient had I simply referred to those cases, and to the reasoning of the learned judges who decided

them, as quite conclusive upon the question. See, also, 275 *Tons of Mineral Phosphates*, 9 FED. REP. 209.

But the course of argument has led me to consider the question and the authorities at some length, and I am constrained to say that if the question were an original one I should have little hesitation in coming to the conclusion announced. The libelants received from the consignee, or the consignee's representative, the freight money due them, but it was received under protest and subject to the demurrage claim; and, upon the facts shown, I am of the opinion that the lien for demurrage was not waived or lost by reason of anything that transpired in relation to delivery of the cargoes or receipt of the freight moneys.

Decree for libelants.