**MIDDLE ATLANTIC CONFER-
ENCE et al., Plaintiffs,**

v.

**UNITED STATES of America and Inter-
state Commerce Commission,
Defendants.**

**Civ. A. No. 1166–70.**

United States District Court,
District of Columbia.

Dec. 21, 1972.

Bryce Rea, Jr., John R. Bagileo, Washington, D. C., for plaintiffs Middle Atlantic Conference, Eastern Central Motor Carriers Assn., Inc., and The New England Motor Rate Bureau, Inc. (intervenor).

John Womack, Louisville, Ky., for plaintiff Central & Southern Motor Freight Tariff Association, Inc.

Guy H. Postell, Atlanta, Ga., for plaintiff Southern Motor Carriers Rate Conference.

Harold A. Titus, Jr., Washington, D. C., for defendants United States and United States District Court.

John H. D. Wigger, Washington, D. C., for defendant Dept. of Justice.

Raymond Zimmet, I. C. C., Washington, D. C., for defendant I. C. C.

Arthur L. Shipe, Burlington, Mass., for intervening plaintiff The New England Motor Rate Bureau, Inc.

John F. Donelan, John M. Cleary and John H. Caldwell, Washington, D. C., for intervening plaintiff The National Industrial Traffic League.

William P. Sullivan, Washington, D. C., for intervening defendants National Assn. of Refrigerated Warehouses, Inc. and American Warehousemen's Assn.

Charles B. Myers, Chicago, Ill., for intervening defendant American Warehousemen's Assn.

Robert G. Seaks, Washington, D. C., Harry N. Babcock, Cleveland, Ohio, Rene J. Gunning, Baltimore, Md., for intervening defendants The Chesapeake and Ohio Railway Company and Western Maryland Railway.

## OPINION

Before TAMM * and MacKINNON,* Circuit Judges, and PARKER, District Judge.

MacKINNON, Circuit Judge:

This is an action seeking to set aside and enjoin a report and order of the Interstate Commerce Commission (Commission). Our jurisdiction is invoked under 28 U.S.C. §§ 1336, 1398, 2284, 2321 and 2325. Briefly stated, the Commission order prohibits motor common carriers from specifying in their tariffs that certain warehousemen, pier operators, brokers, steamship agencies, and others similarly situated (generally referred to hereinafter as warehousemen), *who are neither consignors nor consignees,* are to be liable under certain circumstances for charges for the undue detention (demurrage) of trucks being loaded or unloaded at their premises.

Various motor carrier associations [1] filed proposed tariffs with the Commission, seeking to establish charges for the detention of a carrier's vehicle beyond the so-called free time for loading and unloading cargo.[2] The material provisions of the tariff schedules which the complaint seeks to uphold are substantially as follows:

> Except as otherwise specifically provided, when due to no disability, fault or negligence on the part of the carrier, the loading or unloading of freight . . . is delayed beyond the free time authorized . . . charges in Sec. 4 will be assessed against the consignor (Notes B and C) if the delay occurs at his premises, and against the consignee (Notes B and D) if the delay occurs at his premises
>
> . . . .
>
> NOTE B: *Under this rule, the agent or representative of consignor or consignee, forwarding or receiving*

---

* Serving with Judge Parker as members of the District Court of three judges designated by the Chief Circuit Judge by order herein of November 9, 1970.

1. The plaintiffs in this case are the Middle Atlantic Conference, the Central & Southern Motor Freight Tariff Association, Inc., the Eastern Central Motor Carriers Association, Inc. and the Southern Motor Carriers Rate Conference. The New England Motor Rate Bureau, Inc. and the National Industrial Traffic League have intervened on plaintiffs' behalf before the Commission and as intervening plaintiffs before this court. The National Association of Refrigerated Warehouses, Inc., the American Warehousemen's Association, the Chesapeake & Ohio Railway Co. and the Western Maryland Railway have intervened before the Commission on the defendants' behalf and as intervening defendants before this court.

2. The purpose of detention charges is to facilitate transportation by providing an incentive to avoid tying up a carrier's vehicles for unnecessary periods of time. Detention of Motor Vehicles—Middle Atlantic and New England Territory, 325 I.C.C. 336, 340 (1965).

The plaintiffs have maintained that the tariff provisions they seek are desirable because they place "the responsibility upon the only person who can eliminate the undue detention—the person who actually causes the undue detention." Opening Statement of Facts and Argument of National Industrial Traffic League, filed March 6, 1967, p. 4.

*a shipment for account of consignor or consignee will be treated as a consignor or consignee.*

NOTE C: "Consignor" as used in this item means the party from whom the carrier receives the shipment or any part thereof, for transportation at point of origin or any stop-off point, whether he be original consignor, or *warehouseman,* or *connecting air, motor, rail or water carrier* with which the carrier does not maintain joint through rates, *or other person to whom the bill of lading is issued.*

NOTE D: "Consignee" as used in this rule means *the party to whom the carrier is required by the bill of lading or other instruction, to deliver the shipment, or any part thereof,* at destination or any stop-off point, whether he be ultimate consignee, or *warehouseman, or connecting air, motor, rail or water carrier with whom the carrier does not maintain joint through rates, or other person designated in the bill of lading.* [Emphasis added.]

In short, the scheme of the tariff proposal is to make warehousemen, agents, etc., liable for detention charges by a unilateral redefinition of consignors and consignees to include persons who are neither consignors nor consignees.

Under this plan of the motor carriers to use the device of a tariff which has the force of law [3] to impose liability for detention charges, the charges would accrue only where the overlong detention was not "due" to any "disability, fault or negligence . . . of the carrier" and if that requirement were satisfied, then under the tariff, with respect to shipments delivered to a warehouseman, agent, etc., the warehouseman would become automatically liable even though the delay was occasioned by factors outside his control.[4] There is no present controversy over the actual amounts of the charges. However, the proposed tariffs seek to provide not only for the amounts of the detention charges, but also for the imposition of liability for the charges *against particular parties.*

In general, the charges are to be imposed by virtue of the tariff provision directly on the party at whose premises the delay occurs even if that party were an agent of the consignor or consignee, such as a warehouseman, pier operator, or other agent or bailee for hire and *not an actual party to the contract of transportation, i. e.,* a person not named in the bills of lading as consignor or consignee.[5] This last feature of the proposed tariffs is the one which creates the present controversy. Hereafter we will refer to warehousemen only, they

---

3. Crancer v. Lowden, 315 U.S. 631, 635, 62 S.Ct. 763, 86 L.Ed. 1077 (1942); Lowden v. Simonds-Shields-Lonsdale Grain Co., 306 U.S. 516, 520, 59 S.Ct. 612, 83 L.Ed. 953 (1939); Swift & Co. v. Hocking Valley Ry., 243 U.S. 281, 285, 37 S.Ct. 287, 61 L.Ed. 722 (1917); Pennsylvania R.R. v. International Coal Co., 230 U.S. 184, 197, 33 S.Ct. 893, 57 L.Ed. 1446 (1913); Pennsylvania R.R. v. Moore-McCormack Lines, Inc., 246 F.Supp. 143, 147 (S.D.N.Y.1965); Central R.R. of New Jersey v. Anchor Line, 219 F. 716, 717 (2d Cir. 1914).

4. We do not discuss the mischief such a detention rule would create in practical application.

5. Previous to the instant tariff filings, the Commission had required that detention charges be assessed "against the shipment." Detention of Motor Vehicles—

Middle Atlantic and New England Territory, 325 I.C.C. 336, 366 (1965). This places the liability for the charges on that party liable for the basic freight charges.

The Commission summarized the substance of the instant tariff filings as follows:

Representative of such publications are the provisions proposed by Central & Southern which provide that detention charges "shall be paid either by the consignor or consignee, whichever causes the delay, irrespective of the responsibility for payment of freight or other charges." . . . [T]he tariff defines the terms "consignor" and "consignee" to include agents, brokers, steamship agencies, and custom brokers acting in their [consignors and consignees] behalf

. . . .

335 I.C.C. at 538.

being representative of the class of third parties, agents and representatives of consignors and consignees upon whom the carriers seek to impress liability for detention charges.

The Commission has rejected the proposed tariffs as being "unlawful," [6] and the motor carrier associations now bring this action to set aside, annul and enjoin the report and order of the Commission. 28 U.S.C. § 1336(a) (1964).[7] A three-judge District Court has been convened to hear and decide the case pursuant to 28 U.S.C. § 2325 (1964).[8]

Plaintiffs frame the issue to be:

[O]nly a question of law, i. e., whether the Interstate Commerce Act and the body of case law developed before and since that Act was passed permit the imposition [by means of a tariff] of liability for detention charges *on others than persons named in bills of lading as consignors or consignees of shipments.*

Plaintiffs' br. p. 5 (emphasis added). To state the issue completely it is necessary to add that the carrier seeks to create this new rule of liability "by means

of a tariff." This formulation of the issue by plaintiffs is a clear admission that the carriers are attempting through the tariff to *impose* liability upon parties who are not named in the bills of lading as consignors or consignees. In the absence of this tariff provision the warehousemen would not be liable for detention charges under such circumstances and thus what is attempted is in effect a "legislative" change in the current law determining their liability.

**I**

The right to assess detention or demurrage charges against parties to a contract of transportation because of delay in releasing transportation equipment is presently well established.[9] Motor carriers term such delay as detention. Railroads refer to it as demurrage. Prior to the coming of the railroad, liability for demurrage of ships was recognized in maritime law as the amount to be paid for delay in loading, unloading or sailing beyond the time specified.[10] In maritime transactions the time schedule for such acts was frequently fixed in the charter party [11] or

6. Docket No. 34767, Responsibility for Payment of Detention Charges, Eastern Central States, 335 I.C.C. 537, (1969), aff'g 332 I.C.C. 585 (1968). The Commission's report and order also embraces Docket No. 34767 (Sub-No. 1), Responsibility for Payment of Detention Charges, Central & Southern States; Docket No. 34767 (Sub-No. 2), Responsibility for Payment of Detention Charges in Various Motor Carrier Regions; and Docket No. 34767 (Sub-No. 3), Responsibility for Payment of Detention Charges in Central States.

7. 28 U.S.C. § 1336(a) provides:
   (a) Except as otherwise provided by Act of Congress, the district courts shall have jurisdiction of any civil action to enforce, enjoin, set aside, annul or suspend, in whole or in part, any order of the Interstate Commerce Commission.

8. 28 U.S.C. § 2325 provides:
   An interlocutory or permanent injunction restraining the enforcement, operation or execution, in whole or in part,

of any order of the Interstate Commerce Commission shall not be granted unless the application therefor is heard and determined by a district court of three *judges under section 2284 of this title.* June 25, 1948, c. 646, 62 Stat. 970.

9. 49 U.S.C. §§ 3(2), 105; 13 Am.Jur. Carriers §§ 480–92; 13 C.J.S. Carriers §§ 334–347.

10. Hartman, Law and Theory of Railway Demurrage Charges 1–5 (1928).

11. A charter party is a *contract* of affreightment whereby the owner of a ship lets the whole, or a part of her, to a shipper for the conveyance of goods in consideration of the payment of freight. The term is derived from the words "charta-partita" which in England and Aquitaine were written on the cards containing the provisions of the contract. Such cards were afterwards divided into two parts, each party taking one, and then placed together when the parties desired to know the terms of their contract. Bouvier's Law Dictionary.

bill of lading [12] but if not so agreed upon there was an implied promise by the shipper or consignee to perform such activities within a reasonable time, or, in default thereof, to become liable for demurrage.[13] If a specific demurrage rate was not fixed in the charter party or bill of lading a reasonable rate would be required [14] and the law recognized that the ship owner or master had a lien on the cargo for such demurrage even though the bill of lading did not contain a demurrage clause.[15] This is an outgrowth of a legal concept, peculiar to contracts of shipment at maritime law, which has been stated as follows:

> And as, in the eye of the law, maritime, upon commercial reasons, the master of the ship is deemed to contract, in respect to the freight, rather with the merchandise than with the shipper, and his rights are, therefore, not made to depend upon any doctrine of agency.

275 Tons of Mineral Phosphates, 9 F. 209, 211 (D.C.E.D.N.Y.1881).[16] While demurrage originated in maritime law, the legal principles applicable to ship demurrage are not completely applicable to demurrage charges by land carriers in this country.[17] As Judge Prettyman observed, such charges by railroads "are sui generis," [18] and the same is true of detention charges by motor carriers. This makes it necessary, in applying maritime decisions to issues such as we have here, to give full consideration to the different settings in which maritime demurrage cases arise. Where the master of a ship was deemed to contract with the freight, in the transportation contracts of our rail and motor carriers the carrier is considered to contract directly with the shipper.[19] Thus, to

---

12. Hutchinson, Carriers § 842 (3d ed. 1906); The Hyperion's Cargo, 12 Fed. Cas. p. 1138, 2 Low. 93, 7 Am.Law Rev. 457 (D.C.Mass.1871). *See also,* The Arizpa, 63 F.2d 42 (4th Cir. 1933); Hawgood v. 1,310 Tons of Coal, 21 F. 681 (D.C.Wis.1884); The Corfe Castle, 221 F. 98, 105 (D.C.E.D.N.Y.1915); Sprague v. West, 22 Fed.Cas. p. 970, 3 Am.Law J. 202 (1849).

13. "Reasonable promptitude in delivering a cargo at its point of shipment, and in receiving it at its destination, is a duty implied in such contracts, and for a violation of it damages in the nature of demurrage are recoverable. *This is too well settled, both in England and in this country, to need discussion or authority.*" (Emphasis added) The M.S. Bacon v. Erie & Western Transp. Co., 3 F. 344 (W.D.Pa.1880). 275 Tons of Mineral Phosphate, 9 F. 209 (D.C.E.D.N.Y.1881); 2 Hutchinson, Carriers § 842 (3d ed. 1906) and cases cited therein at n. 15; Sprague v. West, 22 Fed.Cas. pp. 970, 971, 3 Am.Law J. 202 (1849); The William Marshall, 29 F. 328 (D.C.D.Md.1886). *See also,* Irzo v. Perkins, 10 F. 779 (D.C. S.D.N.Y.1881).

14. 2 Hutchinson, Carriers § 832 (3d ed. 1906); *see also,* 275 Tons of Mineral Phosphate, 9 F. 209 (D.C.E.D.N.Y.1881); Hawgood v. 1,310 Tons of Coal, 21 F. 681 (D.C.Wis.1884); *cf.* The Apollon, 9 Wheat. 361, 6 L.Ed. 111 (1824).

15. 2 Hutchinson, Carriers § 856 (3d ed. 1906); Hawgood v. 1,310 Tons of Coal, *supra* note 14; 275 Tons of Mineral Phosphate, 9 F. 209 (D.C.E.D.N.Y.1881); The Hyperion's Cargo, *supra* note 12.

16. To the same effect: "It is a maxim of the general law-merchant that the ship is bound to the merchandise, and the merchandise [is bound] to the ship." The Hyperion's Cargo, *supra* note 12, 12 Fed. Cas. at p. 1138. *See also,* Hawgood v. 1,310 Tons of Coal, *supra* note 14; Stafford v. Watson, 22 Fed.Cas. p. 1031, 1 Biss. 437 (1864).

17. Hartman, *supra* note 10, at 1–2; 1 Michie, Carriers § 980 (1915); Miller v. Georgia R. & Banking Co., 88 Ga. 563, 15 S.E. 316 (1891).

18. Iversen v. United States, 63 F.Supp. 1001, 1005 (D.D.C.), aff'd 327 U.S. 767, 66 S.Ct. 825, 90 L.Ed. 998 (1946).

19. Brown Transport Corp. v. United Merchants & Mfrs., 21 A.D.2d 303, 250 N.Y.S.2d 440 (1964); Dohrmann Hotel Supply Co. v. Owl Transfer & S. Co., 19 Wash.2d 522, 143 P.2d 441, 446, 149 A.L.R. 1108 (1943); Chicago, B. & Q. R.R. v. Evans, 221 Mo.App. 757, 288 S.W. 73, 75 (1926); Thomas Canning Co. v. Southern Pac. Co., 219 Mich. 388, 189 N.W. 210, 213 (1922).

make shippers and others liable to the carrier in connection with the transportation of goods requires a stronger direct contractual base between the parties than in maritime contracts which historically left more rights to be determined according to the reciprocal privileges between the master and the cargo. Land carriers in the United States must rely upon liabilities created according to common law principles.[20]

## II

Under section 217(a) of Part II of the Interstate Commerce Act, 49 U.S.C. § 317(a) (1964),[21] every motor common carrier subject to the Act must file with the Commission its "tariffs" showing all "rates, fares, and charges for transportation, and all services in connection therewith, of passengers or property . . . ." Truckers file their detention charges and the rules, regulations, or practices affecting those charges in conformance with this requirement. The Commission is then vested with statutory power to pass on the *lawfulness* of the charges, as well as the rules, regulations, or practices affecting them. Section 216(g) of Part II of the Act, 49 U. S.C. § 316(g) (1964).[22]

20. In re Tidewater Coal Exch., 292 F. 225, 235 (D.C.S.D.N.Y.1923), aff'd 296 F. 701 (2d Cir.), cert. denied, 264 U.S. 596, 44 S.Ct. 454, 68 L.Ed. 868 (1924). *See also* Missouri-Kansas-Texas R.R. v. Standard Industries, 192 Kan. 381, 388 P.2d 632 (1964) ; Pennsylvania R.R. v. Susquehanna Collieries Co., 23 F.2d 499 (D.C.E.D. Ohio 1927) as to the basic *ex contractu* nature of an action for demurrage charges.

21. Section 217(a) provides as follows:
(a) Every common carrier by motor vehicle shall file with the Commission, and print, and keep open to public inspection, tariffs showing all the rates, fares, and charges for transportation, and all services in connection therewith, of passengers or property in interstate or foreign commerce between points on its own route and between points on its own route and points on the route of any other such carrier, or on the route of any common carrier by railroad and/or express and/or water, when a through route and joint rate shall have been established. Such rates, fares, and charges shall be stated in terms of lawful money of the United States. The tariffs required by this section shall be published, filed, and posted in such form and manner, and shall contain such information, as the Commission by regulations shall prescribe; and the Commission is authorized to reject any tariff filed with it which is not in consonance with this section and with such regulations. Any tariff *so rejected* by the Commission shall be void and its use shall be *unlawful*. (Emphasis added.)

22. Section 216(g) provides as follows:
(g) Whenever there shall be filed with the Commission any schedule stating a new individual or joint rate, fare, charge, or classification for the transportation of passengers or property by a common carrier or carriers by motor vehicle, or by any such carrier or carriers in conjunction with a common carrier or carriers by railroad and/or express, and/or water in interstate or foreign commerce, or any rule, regulation, or practice affecting such rate, fare, or charge, or the value of the service thereunder, the Commission is authorized and empowered upon complaint of any interested party or upon its own initiative at once and, if it so orders, without answer or other formal pleading by the interested carrier or carriers, but upon reasonable notice, to enter upon *a hearing concerning the lawfulness of such rate, fare, or charge, or such rule, regulation, or practice*, and pending such hearing and the decision thereon the Commission, by filing with such schedule and delivering to the carrier or carriers affected thereby a statement in writing of its reasons for such suspension, may from time to time suspend the operation of such schedule and defer the use of such rate, fare, or charge, or such rule, regulation, or practice, but not for a longer period than seven months beyond the time when it would otherwise go into effect; and after hearing, whether completed before or after the rate, fare, charge, classification, rule, regulation, or practice goes into effect, the Commission may make such order with reference thereto as would be proper in a proceeding instituted after it had become effective. If the proceeding has not been concluded and an order made within the period of suspension, the proposed change of rate, fare, or charge, or classification,

The Commission stated that "the lawfulness of the provisions in question is governed by [the] decision of the entire Commission in the first *Detention* case [Detention of Motor Vehicles—Middle Atlantic and New England Territory, 318 I.C.C. 593 (1962)] and that such [tariff] provisions are unlawful to the extent that they attempt to place liability for detention charges upon a person not a party to the contract of transportation." 335 I.C.C. at 542. In the first *Detention* case, where the Commission denied the motor carriers' initial attempt to accomplish the same essential result as they seek here, the holding was that the "status [of warehousemen, pier operators and others not a party to the contract of transportation] cannot be changed by publishing tariff provisions which purport to make them consignors-consignees for the purpose of assessing [detention] charges . . . ." (318 I.C.C. at 607) and it cited for authority New York Board of Trade and Transportation v. Director General, 59 I.C.C. 205 (1920); Central R. R. of New Jersey v. Anchor Line, 219 F. 716 (2d Cir. 1914); and Smokeless Fuel Co. v. Norfolk & Western Ry., 85 I.C.C. 395 (1923).[23] In the instant Commission proceedings, the Division 2 findings rejecting the tariffs were upheld in the following language:

> In view of the foregoing, we adopt division 2's finding in the prior report that the *lawfulness* of the provisions in question is governed by decision of the entire Commission in the first *Detention* case and that such [tariff]

provisions are *unlawful* to the extent that they attempt to place liability for detention charges upon a person not a party to the contract of transportation.

335 I.C.C. at 542 (emphasis added). The Commission took pains to emphasize the precise grounds of its decision:[24]

> Division 2 found the provisions involved unlawful not because they purport to place liability on the party causing the delay, but on a more generic ground, to wit: "because they attempt to place liability for detention charges upon a person *not a party to the contract of transportation.*"

*Id.* at 543 (emphasis in the original).

■ We agree with the Commission's determination that the proposed tariff was unlawful insofar as it attempted to impose liability for demurrage charges upon an agent who was not a party to the contract of transportation. This finding of unlawfulness was adequately supported by the history of demurrage, the common law and ICC precedent. New York Board of Trade and Transportation v. Director General, 59 I.C.C. 205, 209 (1920); Central R.R. of New Jersey v. Anchor Line, 219 F. 716 (2d Cir. 1914); Missouri K. & T. Ry. of Texas v. Capital Compress Co., 50 Tex. Civ.App. 572, 110 S.W. 1014 (1908); Stafford v. Watson, 22 Fed.Cas. p. 1031, 1 Biss. 437 (1864). The dearth of precise precedent is attributable to the rarity of attempts by carriers to hold persons liable for demurrage who were not parties to the contract.

23. *See* discussion *infra* and note 28, *infra.*

24. The Commission also mentioned and approved an alternative ground for its holding, *i. e.,* that the phrase "party causing the delay" in the proposed tariff was "indefinite and unclear in violation of section 217 of the act." 335 I.C.C. at 542. However, because of our decision upholding the Commission on its principal ground, we do not reach the propriety of this determination by the Commission that the tariff provisions were unlawfully vague.

rule, regulation, or practice, shall go into effect at the end of such period: *Provided,* That this subsection shall not apply to any initial schedule or schedules filed on or before July 31, 1938, by any such carrier in bona fide operation on October 1, 1935. At any hearing involving a change in a rate, fare, charge, or classification, or in a rule, regulation, or practice, *the burden of proof shall be upon the carrier to show that the proposed changed rate, fare, charge, classification, rule, regulation, or practice is just and reasonable.* (Emphasis added.)

In *New York Board of Trade*, the Commission dealt with a challenge to certain demurrage rules brought by consignees who were regularly being held responsible for detention charges. The Commission found that where shipments moved by rail to dockside, thence by lighters and barges to the steamships that would ultimately deliver them to their consignees, the steamship companies acted as agents of the consignees in dealing with the railroads.

> The real source of complaint seems to be the difficulty which consignees experience in enforcing their rights against their agents, the steamship companies. As already indicated, the steamship companies are usually responsible for the delays which result in demurrage, and the rail carriers attempt to collect the charges from them. But if the steamship company refuses to pay, *the rail carrier has no recourse other than resort to the consignee, for the courts have decided that the steamship company is not a party to the contract of transportation over the rail lines and can not be held liable by the rail carrier for demurrage.* See Central R. Co. of New Jersey v. Anchor Line, 219 F. 716.

59 I.C.C. at 209 (emphasis added). In Central R.R. of New Jersey v. Anchor Line, *supra*, cited by the Commission in *New York Board of Trade*, the Second Circuit noted that a steamship, which was not a party to the contract, but which received cargo for foreign shipment from a railroad, could not be held liable for demurrage charges merely "by naming them in the tariff." 219 F. at 718.

In Missouri K. & T. Ry. of Texas v. Capital Compress Co., 50 Tex.Civ.App. 572, 110 S.W. 1014 (1908), a company which compressed cotton in transit and then returned the bales to the freight cars for further transportation, was held not be liable for demurrage since it did not authorize the shippers to designate it as consignee, did not appear in any of the bills of lading as consignees and never accepted any of the shipments as con-signee. Under such circumstances the court decided that the compress company was acting as agent for the owners, that there was no contractual relation between it and the railroad, and *"for that reason . . . was not liable for the demurrage. . . . "*

> The findings of fact fail to show any contractual relation between them in reference to the shipment of the cotton, and, *for that reason*, appellee was not liable for the demurrage sought to be recovered. Appellee was engaged in the business of compressing cotton. The cotton in question did not belong, and was not consigned to it, but to other persons. Appellee compressed the cotton, and, acting as *agent* for the owners, delivered it to appellant for transportation, and collected from it the charges for compression. We think the trial court ruled correctly when it held, on the facts referred to, that appellee was not liable for demurrage, if any had accrued.

110 S.W. at 1016 (emphasis added). Stafford v. Watson, 22 Fed.Cas. p. 1031, 1 Biss. 437 (1864) also held that an agent for a maritime shipper, whose agency was disclosed to the carrier, was not liable for a ship's demurrage charges.

In re Tidewater Coal Exch., 292 F. 225 (D.C.S.D.N.Y.1923), aff'd 296 F. 701 (2d Cir.), cert. denied, 264 U.S. 596, 44 S.Ct. 454, 68 L.Ed. 868 (1924), also denied a railroad's claim for demurrage against an exchange acting for consignees on the ground that the fact of agency was known to the railroad and hence there was no contract with the exchange (an agent for a disclosed principal) upon which liability could be imposed.

> The person liable . . . is to be ascertained by the ordinary rules of common law . . . . 292 F. at 235.

> [I]n case it had appeared that [a factor] was only an agent, the ordinary rules of liability would apply and . . . the principal alone would have been liable. 292 F. at 234.

■ Before such transportation-related assessments as detention charges can be imposed on a party on a prescribed basis there must be some legal foundation for such liability outside the mere fact of handling the goods shipped.[25] What the carriers here attempt is not to collect demurrage on claims arising *ex delicto* out of the wrongful conduct of warehousemen [26] but instead to establish throughout a large part of the nation a regular system of demurrage charges that will make warehousemen liable for such charges as a more or less normal incidence of their everyday commercial transactions. Under such circumstances the liability, as for freight charges, must be founded either on contract, statute or prevailing custom.[27] Southern Ry. System v. Leyden Shipping Corp., 290 F.Supp. 742, 745 (D.C.S.D.N.Y. 1968) [28]; Brown Transport Corp. v. United Merchants & Manufacturers, Inc., 250 N.Y.S.2d 440 (1964). *See also* American Ry. Express Co. v. Mohawk Dairy Co., 250 Mass. 1, 144 N.E. 721, 35 A.L.R. 14 (1924).[29] The adjudicated cases do not require that there be a specific contract to pay demurrage but it must arise out of contract [30] and in practically every instance the obligation is only enforced upon persons who are parties to the contract of carriage.

The National Industrial Traffic League, an intervening plaintiff, in its reply brief, p. 7, cites Michie, Carriers § 976 in support of its assertion that "the right to demurrage . . . exists in-

25. *See, e. g.,* Smokeless Fuel Co. v. Norfolk & Western Ry., 85 I.C.C. 395, 401 (1923), where the Commission observed that for purposes of fixing demurrage charges, "the law seems to be well settled that the party to whom a shipment is consigned is the legal consignee and not the party in whose care the goods are shipped." There is no claim here that the warehouseman appears as a consignee on the bill of lading.

26. When Justice Story in The Apollon, 9 Wheat. 361, 376, 6 L.Ed. 111 (1824) said that demurrage was "often a matter of contract, but not necessarily so" and then went on to affirm the imposition of liability for detention of a vessel in an action *ex delicto* for a marine tort, he was referring to and awarding *damages in the nature of demurrage* and not imposing demurrage as an incident of a valid commercial transaction. In that case, where the Apollon was improperly seized and damages were to be assessed, it was obvious that the civil demurrage rate would be part of any fair measure of damages for her unlawful seizure and detention. The fact that carriers by land have adopted the term demurrage (detention) from the maritime law does not require that matters relating thereto be determined by maritime law. Michie, Carriers § 980 (1915). Actually, there are a number of situations where maritime law does not apply to demurrage charges of other carriers.

27. *See* discussion *infra* and note 32, *infra.*

28. "[Liability] for the freight charges or demurrage . . . may be created only by contract or statute . . ." Southern Ry. System v. Leyden Shipping Corporation, 290 F.Supp. 742 (1968).

29. Justice Brandeis remarked in Louisville & N. R.R. v. Central Iron Co., 265 U.S. 59, 67, 44 S.Ct. 441, 443, 68 L.Ed. 900 (1924) that the determination of who is liable for freight charges depends on "what promise, if any, to pay freight charges was, in fact, made . . . ." [In] the absence of a contract that the consignee shall pay the freight charges [even] he is not legally bound to do so. Chicago, B. & Q. R.R. v. Evans, 221 Mo. App. 757, 288 S.W. 73, 76 (1926). American Ry. Express Co. v. Mohawk Dairy Co., 250 Mass. 1, 144 N.E. 721, 724 (1924) is to the same effect. In fact, a motor carrier cannot even collect freight charges from the owner of goods transported in the absence of contract or dealings between the owner and carrier where the owner was neither consignor nor consignee and goods were not diverted or reconsigned. Brown Transport Corp. v. United Merchants & Mfgrs., 250 N.Y.S.2d 440 (1964). While demurrage charges are not the same as line-haul charges there is nothing about them that is sufficiently different so that liability for their payment could be created by something less than ordinary common law principles.

30. Missouri-Kansas-Texas R.R. v. Standard Industries, 192 Kan. 381, 388 P.2d 632 (1964); Pennsylvania R.R. v. Susquehanna Collieries Co., 23 F.2d 499 (D.C.E.D.Ohio 1927).

dependent of contract or statute." The entire quotation relied upon states:

> Demurrage is often a matter of contract, but not necessarily so. Independent of any express or implied contract of plaintiffs to be bound by the rules, the modern doctrine in this country is that the right to demurrage, in such circumstances, exists independent of contract or statute.

However, that reference does not reach the issue under consideration here. Michie states only that demurrage may be assessed *against the parties to the transportation contract* (or against the merchandise) without the necessity of there being any specific independent contract to pay demurrage. The statement cannot be interpreted, as the plaintiff-intervenor contends, to mean that demurrage charges may be assessed in the absence of contract against persons other than those named in bills of lading as consignors or consignees of shipments. The cases cited by Michie in its supporting footnote involved shippers, consignors, consignees, the carriers' lien rights against the shipment, and some involved the validity of demurrage rules and provisions. therefor. None of the cited cases decide that a warehouseman or agent who is *not* named in a bill of lading as consignor or consignee may be held liable for the payment of detention charges.[31]

█ It would have been more to the point to quote further from Michie on the question whether an *agent* of a party to the transportation contract is liable for demurrage. Actually, in the same paragraph that is quoted partially by the intervenors, Michie refers to a

---

31. Hawgood v. 1,310 Tons of Coal, 21 F. 681 (D.C.Wis.1884) held that in maritime law a ship owner had a valid lien against the cargo for demurrage even though the bill of lading contained no demurrage clause. Miller v. Georgia R. & Banking Co., 88 Ga. 563, 15 S.E. 316 (1891) upheld a railroad demurrage regulation applicable to *"customers"* who have contracted with knowledge thereof. Dixon v. Central of Georgia R.R., 110 Ga. 173, 35 S.E. 369 (1900) determined that a carrier could have a lien against a *shipper* under Georgia law. Kentucky Wagon Mfg. Co. v. Ohio & M. R.R., et al., 98 Ky. 152, 32 S.W. 595 (1895) involved the validity of demurrage rules where applicable notice was given to *shippers* and *consignees*. Miller v. Mansfield, 112 Mass. 260 (1873) held that for delay in unloading the railroad had a lien as warehouseman upon the goods for storage as against a *consignee* with notice under an implied promise to pay. Owen v. St. Louis & S.F. R.R., 83 Mo. 454 (1884) allowed a railroad to assess demurrage against a *shipper* where the way bills included provisions therefor. In McGee v. Chicago, R.I. & Pac. R.R., 71 Mo.App. 310 (1897), the bill of lading contained an express stipulation with respect to demurrage but the jury found the *shipper* was not guilty of unreasonable delay. Darlington v. Missouri Pac. R.R., 99 Mo. App. 1, 72 S.W. 122 (1902) involved only *consignees* as did Huntley v. Dows, 55 Barb. 310 (N.Y.1864). In Erie R. Co. v. Waite, 62 Misc. 372, 114 N.Y.S. 1115 (1909) it was held that demurrage may be imposed upon *consignees* independent of statute or express contract. Norfolk & W. R.R. v. Adams, 90 Va. 393, 18 S.E. 673 (1894) allowed recovery of demurrage against a *consignee*. Gage v. Morse, 12 Allen 410, 90 Am.Dec. 155 (Mass. 1866) held that a *consignee* of a vessel was not liable for demurrage where the bill of lading contained no provision for payment thereof and especially not since the cargo was shipped to consignee or his assigns and the cargo was sold to a third person on the day the ship arrived in port. In the course of the decision the court stated:

> The defendant is not liable, unless upon *some contract, express or implied*, by which he has agreed to pay the plaintiff demurrage. No express contract is shown; and we are unable to perceive that any can be implied from the facts agreed.
>
> The direct contract of the plaintiff under the bill of lading was with the shipper of the coal: Blanchard v. Page, 8 Gray, 281, 290–295. . . .
> If the consignee will take the goods, he adopts the contract. . . . But as the consignee and his assigns are not parties to the contract in the bill of lading, and are only liable upon the contract which may be implied upon the actual delivery of the cargo and waiver of his lien by the master, they are not bound to accept the cargo at any particular time, and incur no responsibility by a refusal or delay in accepting it.

case which directly involved the question we are here considering:

A corporation was organized to compress cotton and operate a compress. It did not authorize shippers to consign cotton to it, and did not accept any cotton as consignee. As *agent* of the owners, it delivered cotton to a railroad for transportation and collected from the railroad the charges for compensation. The corporation was not liable to the railroad company for demurrage, *there being no contractual relation between the corporation and the railroad with reference to the shipment of cotton.* [Emphasis added.]

That case is Missouri K. & T. Ry. of Texas v. Capital Compress Co., discussed *supra,* and, rather than tending to support plaintiffs' position supports that of the Commission. With respect to the liability of a shipper's agent for demurrage Michie further states at page 712:

*Agent.*—An *agent* who buys produce and ships it for another, having no concern with it afterwards, is not responsible for damages growing out of a failure of the owner to cause delivery within a reasonable time, *in the absence of an express stipulation to that effect.* [Stafford v. Watson, 22 Fed.Cas.No.13,276, 1 Biss. 437, 2 Chi. Leg.News 385] . . . The owner of a vessel, having abandoned his lien on the cargo for demurrage, can not maintain an action for damages against the shippers, who were merely *agents.* [Stafford v. Watson, 22 Fed. Cas.No.13,276, 1 Biss. 437, 2 Chi.Leg. News 385; Irzo v. Perkins, 10 Fed. 779; The William Marshall, 29 Fed. 328] [Emphasis added; footnotes supplied in text.]

Since persons liable for demurrage charges are to be determined by the ordinary rules of the common law (In re Tidewater Coal Exch., *supra*), the parties to a contract of carriage are perfectly free among themselves to contract with respect to the payment of demurrage, as they are with respect to line-haul charges; but where they have not become contractually obligated to pay demurrage because common law principles exonerate them from liability, and they are not made liable by statute or custom,[32] liability cannot then be imposed upon them legislatively through the device of a tariff.

### III

There is no claim here that any custom is applicable and the only statute that could conceivably be said to deal with these matters is section 223 of the Interstate Commerce Act (49 U.S.C. § 323). However, we agree with the Commission [33] that a careful reading of that section requires a conclusion that it speaks only to the "nonliability" in certain narrow situations of warehousemen, and others similarly situated, who appear as *consignees* on the bill of lading, but in no way can be read to impose liability on an agent not a party to the contract.[34] The law is well settled that

---

32. American Ry. Express Co. v. Mohawk Dairy Co., 250 Mass. 1, 144 N.E. 721, 724 (1924) ; The Corfe Castle, 221 F. 98 (D.C.E.D.N.Y.1915) ; Irzo v. Perkins, 10 F. 779 (1881).

33. Payment for Detention Charges, Eastern Central States, 35 I.C.C. 537, 539 (1969).

34. *See also* Brown Transport Corp. v. United Merchants & Mfgrs., 250 N.Y.S.2d 440 (1964), where the Appellate Division came to the same conclusion with respect to 49 U.S.C. § 3(2), an earlier provision to the same effect as section 223 which applies to railroads. Section 223 provides as follows:

No common carrier by motor vehicle shall deliver or relinquish possession at destination of any freight transported by it in interstate or foreign commerce until all tariff rates and charges thereon have been paid, under such rules and regulations as the Commission may from time to time prescribe to govern the settlement of all such rates and charges, including rules and regulations for weekly or monthly settlement, and to prevent unjust discrimination or undue preference or prejudice : *Provided,* That the provisions of this section shall not be construed to prohibit any such carrier from extending credit in connection

an agent for a disclosed principal is not liable to a third person for acts within the scope of the agency.[35]

**IV**

Certainly warehousemen are free to assume liability for detention

with rates and charges on freight transported for the United States, for any department, bureau, or agency thereof, or for any State or Territory, or political subdivision thereof, or for the District of Columbia. Where any common carrier by motor vehicle is instructed by a shipper or consignor to deliver property transported by such carrier to a consignee other than the shipper or consignor, such consignee shall not be legally liable for transportation charges in respect of the transportation of such property (beyond those billed against him at the time of delivery for which he is otherwise liable) which may be found to be due after the property has been delivered to him, if the consignee (a) is an agent only and had no beneficial title in the property, and (b) prior to delivery of the property has notified the delivering carrier in writing of the fact of such agency and absence of beneficial title, and, in the case of shipment reconsigned or diverted to a point other than that specified in the original bill of lading, has also notified the delivering carrier in writing of the name and address of the beneficial owner of the property. In such cases the shipper or consignor, or, in the case of a shipment so reconsigned or diverted, the beneficial owner shall be liable for such additional charges, irrespective of any provisions to the contrary in the bill of lading or in the contract under which the shipment was made. If the consignee has given to the carrier erroneous information as to who is the beneficial owner, such consignee shall himself be liable for such additional charges, notwithstanding the foregoing provisions of this section. On shipments reconsigned or diverted by an agent who has furnished the carrier with a notice of agency and the proper name and address of the beneficial owner, and where such shipments are refused or abandoned at ultimate destination, the said beneficial owner shall be liable for all legally applicable charges in connection therewith.

That portion of section 223 which might be considered to deal with matters relevant to this case begins at the second full sentence with the words "Where any common carrier . . . ." This is addressed essentially at the problem of the warehouseman, carrier, etc., who, while acting as agent for an undisclosed prin-

cipal, appears as consignee on the bill of lading. As such, he may become liable on acceptance of the goods (subject to the arrangement of the parties and other circumstances outside the scope of this section) for transportation charges for the transportation of property (line-haul charges) to the extent they are billed to him at the time of delivery for which he is otherwise liable, but with respect to "transportation charges . . . found to be due after the property has been delivered to him" (which may include detention charges), the statute provides that a consignee might escape that obligation if certain conditions of notice are satisfied. The fact that the agent for an undisclosed principal appears on the bill of lading as consignee may be due either to the drafting of the original bill or to the reconsignment or diversion of the shipment to a point other than that specified in the original bill of lading. In the former case, he may escape liability and the shipper or consignor will become liable (1) if he is in fact an agent; and (2) if "prior to delivery of the property" he has "notified the delivering carrier in writing of the fact of such agency and the absence of beneficial title." In the situation where there has been a reconsignment or diversion of the shipment, he may escape liability and the "beneficial owner" of the property will become liable if the agent satisfies the above two conditions and additionally (3) if he has also "notified the delivery carrier in writing of the name and address of the beneficial owner of the property."

In no case does section 223 operate to place liability on an agent for a disclosed principal where goods are billed to a consignee in care of a warehouseman, carrier or other agent. It only provides certain methods of avoiding liability where an agent of an undisclosed principal appears on the bill of lading as a consignee without indication of his agency status and who thereby might become liable for detention charges in addition to line-haul charges.

35. Whitney v. Wyman, 101 U.S. 392, 396, 25 L.Ed. 1050 (1879) ; Valkenburg, K-G v. The S.S. Henry Denny, 295 F.2d 330, 333 (7th Cir. 1961) ; United Packinghouse Workers v. Maurer-Neuer, Inc., 272 F.2d 647, 649 (10th Cir. 1959), cert. denied, 362 U.S. 904, 80 S.Ct. 611, 4 L.Ed. 2d 555 (1960) ; New York Board of

charges by contractual undertaking [36] and this is sometimes done through average demurrage agreements to promote their own business and in some instances to obtain the benefits of lower detention costs for the benefit of their customers.[37] However, absent any custom, statutory or contractual basis, for reasons heretofore stated, it would be unlawful to attempt unilaterally to impose such liability on a party outside the contract of transportation by means of a tariff approved by the Commission.[38] A tariff is an inappropriate instrument to "legislate" liability with respect to a nonconsenting party and we find that the Commission acted properly in declining to approve a tariff which purported to do so.[39]

■ Even had the Commission adopted this tariff in accordance with plaintiffs' requests, it would not have effectively imposed liability on "others than persons named in the bills of lading as consignors or consignees of shipments."[40] A long line of cases have held under various transportation acts that attempts by carriers to engraft onto a tariff a gratuitous unilateral provision not contemplated or required by the statute authorizing the filing of tariffs is entirely ineffectual.[41] And we are not cited to any provision in the Interstate Commerce Act, or in the regulations promulgated by the Commission, which authorizes or requires a tariff to include any provision creating liability for detention charges upon an agent for

---

Trade v. Director General, 59 I.C.C. 205, 208, 211 (1920); Restatement (Second) of Agency § 320 (1957); 3 C.J.S. Agency § 215 (1936); 3 Am.Jur.2d Agency § 294 (1962).

36. *See, e. g.,* New York Board of Trade & Transportation v. Director General, 59 I.C.C. 205, 209-10 (1920) which notes that certain contractual provisions were contemplated by the parties which would make the steamship company (agent) liable as a consignee for demurrage charges. After observing that this could not be done by tariff, the Commission approves the possibility of a contractual undertaking.

37. Guandolo, Transportation Law 358 (1965). U. S. Trucking Corp. v. New York, N.H. & H. R.R., 274 I.C.C. 552 (1949), cited by plaintiffs, was such a case.

38. Two cases cited by plaintiffs are not to the contrary. U.S. Trucking Co. v. New York, N.H. & H. R.R., 274 I.C.C. 552 (1949) involved an average agreement where a freight handler had voluntarily agreed to pay demurrage and its liability for demurrage as an agent was not in issue. The case merely holds unreasonable a portion of the demurrage charges assessed.

D. C. Andrews Co. v. Reading Co., 279 I.C.C. 299 (1950) held only that the demurrage charges assessed were reasonable and refused to decide which party was responsible therefor.

39. In the situation in which the warehouseman appears on the bill of lading as an agent of a disclosed principal, for example in an "in care of" capacity,

plaintiffs' proposed tariff would clearly constitute an attempt to change the established law that, "unless otherwise agreed, a person making or purporting to make a contract with another as agent for a disclosed principal does not become a party to the contract." Restatement (Second) of Agency § 320 (1957). *See also* note 35, *supra.*

40. It is clear that plaintiffs are attempting to establish "the lawfulness of the use of tariff publication to specify liability for payment of detention charges," *i. e.,* to change the basic law of contracts and agency to make an agent for a disclosed principal liable for the obligation of his principal. Reply br. of National Industrial Traffic League, intervening pl. at 3, and *see* notes 35, 39, *supra.*

41. Bernard v. United States Aircoach, 117 F.Supp. 134, 140-142 (S.D.Cal.1953); Southern Pacific Co. v. United States, 272 U.S. 445, 47 S.Ct. 123, 71 L.Ed. 343 (1926); Thompson v. Chicago, B. & Q. R.R., 157 I.C.C. 775 (1929); Turoff v. Eastern Airlines, 129 F.Supp. 319, 321 (N.D.Ill.1955); Shortley v. Northwestern Airlines, 104 F.Supp. 152 (D.C.1952); Pacific S.S. Co. v. Cackette, 8 F.2d 259 (9th Cir. 1925); Thomas v. American Airlines, 104 F.Supp. 650 (E.D.Ark. 1952); Toman v. Mid-Continent Airlines, 107 F.Supp. 345 (W.D.Mo.1952). These cases deal primarily with attempts by carriers to impose shorter time limitations on actions brought by passengers than would otherwise obtain under the usual statute of limitations. These efforts have been consistently struck down by courts finding them to be unauthorized unilateral usages of the tariff mechanism.

a disclosed principal who is not a party to the contract, either as consignor or consignee. We accordingly conclude that the Commission acted properly in rejecting the tariff.

## V

■ Plaintiffs suggest that section 202(a) of the Motor Carriers Act, 49 U. S.C. § 302(a), authorizes the Commission to approve the proposed detention rule. This section in its entirety provides:

(a) The provisions of this chapter apply to the transportation of passengers or property by motor carriers engaged in interstate or foreign commerce and to the procurement of and the provision of facilities for such transportation, and the *regulation* of such *transportation*, and of the procurement thereof, and *the provision of facilities therefor*, is [hereby] vested in the Interstate Commerce Commission.

49 U.S.C. § 302(a) (emphasis added); 49 Stat. 543, as amended, 54 Stat. 920. The key word here is "transportation" and that word is defined by section 203 of the Act as follows:

(19) The "services" and "*transportation*" to which this chapter applies *include* all vehicles operated by, for, or in the interest of any motor carrier irrespective of ownership or of contract, express or implied, together with all *facilities and property operated or controlled by any such carrier or carriers*, and used in the transportation of passengers or property in interstate or foreign commerce or in the performance of any service in connection therewith.

49 U.S.C. § 303(a)(19) (emphasis added). This definition also refers to "facilities," does not define the word, but indicates an intent to include only "facilities and property *operated or controlled by any [motor] carrier or carriers . . . .*" (Emphasis added.) With such a limitation being placed on the words "transportation facilities" in the definitional section, which has general effect throughout the entire Act, we find no reason indicating that Congress intended a more expansive interpretation to be given to the word "facilities" in section 202(a). There is nothing in the context of section 202(a) that indicates Congress intended a different meaning for the word. Sections 202(a) and 203(a)(19) must be read together and it would not be reasonable to conclude that when Congress limited "transportation" facilities in section 203(a) (19) to "facilities . . . *operated or controlled by any [motor] carrier or carriers*" (emphasis added) that it intended to remove the limitation when it referred in section 202(a) to "facilities . . . for [transportation]." These provisions are central to the whole Act and it would be more in keeping with the principal purpose Congress stated in the *title* of the Act, which was to provide for the "regulation of the transportation . . . by motor carriers operating in interstate and foreign commerce," P.L. 255, Aug. 9, 1935, c. 498, 49 Stat. 543, to not use these words to extend the jurisdiction of the Commission to facilities not operated or controlled by motor carriers. We are thus unable to find any intent on the part of Congress to extend the plenary jurisdiction of the Commission to the regulation of terminal facilities owned and operated by third parties who are not motor carriers under the Act.[42] Moreover, even if the Commission were vested with plenary authority to the extent that plaintiffs here contend, the Commission has decided that this tariff

---

42. It is also inapposite for plaintiffs to rely upon our decision in American Export-Isbrandtsen Lines, Inc. v. Federal Maritime Commission, 143 U.S.App.D.C. 366, 444 F.2d 824 (1970), since the Federal Maritime Commission in that case was vested by express statutory provision with plenary regulatory authority over marine terminals. The Interstate Commerce Commission is not vested with such jurisdiction over warehouses.

is unlawful. It has thus not exercised the questioned authority and it is therefore not necessary for this court on this record to decide the extent of the Commission's jurisdiction over such matters.

## VI

On the basis of several cases [43] plaintiffs contend that the Commission has authority to approve their imposition of liability for detention charges on warehousemen and pier operators even though the latter are not "subject to the regulatory jurisdiction of the Commission [and] are [not parties] . . . to contracts of carriage." Plaintiffs' br. p. 11. The cases plaintiff cite all involve decisions upholding Commission jurisdiction in fact situations where there was "unjust discrimination." Such decisions merely decide that common carriers subject to the provisions of the Interstate Commerce Act could be prevented by the Commission from using warehouses as the instrumentality whereby they (carriers) give undue and unreasonable preferences, advantages, rebates and concessions, pay illegal allowances for performing loading and unloading services to some warehousemen and not to others, and are thereby guilty of unlawful discrimination relating to transportation.[44] In those cases the authority of the Commission was extended to acts and transactions between carriers subject to the Act and parties not subject to direct regulatory jurisdiction of the Commission because of its power to prohibit the discriminatory *relationship* [45] in which the other parties (warehouses) were directly involved. Here, however, there is no showing that motor carriers are unlawfully discriminating with respect to anyone and the cases cited by plaintiffs are therefore distinguishable on that basis. That the Commission may prevent warehouses and others from being used as the instrumentality of illegal discrimination *by carriers* under its jurisdiction is not equivalent to holding that it has plenary authority to regulate the rights, duties and obligations of local independent

43. Merchants Warehouse Co. v. United States, 283 U.S. 501, 51 S.Ct. 505, 75 L.Ed. 1227 (1931) ; McCormick Warehouse Company v. Pennsylvania R. R., 148 I.C.C. 299 (1928) ; aff'd sub nom. Terminal Warehouse Co. v. United States, 31 F.2d 951 (D.C.D.Md.1929) ; Southern Ry. v. United States, 186 F.Supp. 29 (N.D.Ala.1960) ; Shaw Warehouse Co. v. Southern Ry., 288 F.2d 759 (5th Cir. 1961).

44. At the time Justice Stone wrote the decision in Merchants Warehouse Co. v. United States, 283 U.S. 501, 511, 51 S.Ct. 505, 75 L.Ed. 1227 (1931), the provision prohibiting unlawful discrimination upon which the Commission based its opinion provided :

Sec. 2. That if any common carrier subject to the provisions of this Act shall, directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person or persons a greater or less compensation for any service rendered, or to be rendered, in the transportation of passengers or property or the transmission of intelligence, subject to the provisions of this Act, than it charges, demands, collects, or receives from any other person or per-

sons for doing for him or them a like and contemporaneous service in the transportation or transmission of a like kind of traffic or message under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful.

Feb. 28, 1920, c. 91, § 404, 41 Stat. 479.

45. See especially, Merchants Warehouse Co. v. United States, 283 U.S. 501, 512, 51 S.Ct. 505, 509, 75 L.Ed. 1227 (1931), where the Court refers to "the *relationship* between persons and rail carriers, with which the Commission is authorized to deal . . . ." In McCormick Warehouse Co. v. Pennsylvania R.R., 148 I.C.C. 299, 306 (1928), it was clear that the Commission was acting with respect to a "practice . . . [resulting] in unjust discrimination." Similarly unlawful discrimination in "services" gave the Commission jurisdiction in Terminal Warehouse Co. v. United States, 31 F.2d 951, 958 (D.Md.1929). In Southern Ry. v. United States, 186 F.Supp. 29, 36 (N.D. Ala.1960) and Shaw Warehouse Co. v. Southern Ry., 288 F.2d 759 (5th Cir. 1961) it was prohibited rental "practices."

warehousemen. Under its duty to prevent unlawful discrimination, the power of the Commission would extend to any person used by any common carrier, subject to Commission jurisdiction, to implement a pattern of unlawful discrimination prohibited by the Act, but such authority would clearly not extend to authorizing the Commission to regulate persons or transactions which, as here, are not shown to involve unlawful discrimination.

## VII

Plaintiffs also argue that even if a contractual relationship must exist between a carrier and a warehouseman before demurrage may be assessed against the latter, such a relationship does exist in the form of a quasi contract. In support of this quasi contract theory plaintiffs contend that when the warehouseman causes a detention of the carrier's equipment such warehouseman has received a benefit which gives rise to a quasi contractual relationship. Quasi contracts are created by law for reasons of justice to prevent unjust enrichment of a party, regardless of the expressed intentions of the parties.[46] While quasi contracts have been created in a variety of situations where one party has clearly bestowed a benefit upon another,[47] we decline to create such a contract here where the unjust enrichment of the warehouseman or other

agent is so uncertain. We have not been referred to, nor has our own research disclosed, any cases which have held that the benefits which a warehouseman or agent might receive when he detains a carrier's equipment are such that the warehouseman should be required to compensate the carriers by way of demurrage. Indeed we feel that it would be an unprecedented use of the term "demurrage" to characterize it as compensation for a benefit bestowed upon a party.[48] In its true sense demurrage is part compensation to the carrier and in part a penalty to secure the release of equipment,[49] and in many situations it may be exacted even though no person was benefited.

Plaintiffs also rely on Indiana Harbor Belt R. R. v. Jacob Stern & Sons, 37 F. Supp. 690 (N.D.Ill.1941), to support their quasi contract theory, however, we find this reliance wholly misplaced. In that case a carrier sought to recover demurrage from a consignee for detention of the carrier's railroad cars despite the fact that the cars had been leased to the consignee and were resting on the consignee's own tracks. The court held that in such a situation there was no consideration for a contract to assess demurrage against the consignee. While that court stated that "the contractual status is that which arises under a day-by-day contract for such storage service," it was referring to a liability aris-

---

46. Osborn v. Boeing Airplane Co., 309 F. 2d 99, 102 (9th Cir. 1962); Hill v. Waxberg, 237 F.2d 936, 939, 16 Alaska 477 (9th Cir. 1956); Maple Island Farm v. Bitterling, 209 F.2d 867, 876 (8th Cir. 1954). *See also* 1 Corbin on Contracts § 19 (1963).

47. *See, e. g.*, Bayne v. United States, 93 U.S. 642, 23 L.Ed. 997 (1876); Fidelity and Deposit Co. of Md. v. Harris, 360 F.2d 402 (9th Cir. 1966); Matarese v. Moore-McCormack Lines, 158 F.2d 631 (2d Cir. 1946); Schenley Distillers Corp. v. Kinsey Distilling Corp., 136 F.2d 350 (3d Cir. 1943).

48. The primary purpose of demurrage charges is to promote car efficiency by penalizing under detention of cars. Pennsylvania R.R. v. Kittanning Iron & Steel Mfg. Co., 253 U.S. 319, 323, 40 S.Ct. 532,

64 L.Ed. 928 (1920). While a secondary purpose of demurrage is to compensate the carrier for the use of his car, Turner Lumber Co. v. Chicago, M. & St. P. Ry., 271 U.S. 259, 262 (1926), we feel this purpose is motivated not by a concern that the party detaining the car has been benefited, but that the carrier has suffered some detriment.

49. Turner D. & L. Lumber Co. v. Chicago, M. & St. P. Ry., 271 U.S. 259, 262, 46 S.Ct. 530, 70 L.Ed. 934 (1926); Edward Hines Yellow Pine Trustees v. United States, 263 U.S. 143, 145, 44 S.Ct. 72, 68 L.Ed. 216 (1923); Pennsylvania R.R. v. Kittanning Iron & Steel Co., 253 U.S. 319, 323, 40 S.Ct. 532, 64 L.Ed. 928 (1920); Investigation and Suspension of Advances in Demurrage Charges, 25 I.C.C. 314, 315 (1912). *See* note 30, *supra*.

ing out of a contract of transportation between the shipper and the carrier, and we find nothing therein to support the judicial creation of an obligation to pay demurrage in the situation where, as here, the parties have no contractual relationship with each other.

## VIII

Finally, we note it has been unnecessary to reply to plaintiffs' contention that the Commission's brief to this court relied on a *post hoc* rationalization [50] because that portion of our decision set forth in II above is alone dispositive of the case and it relies solely upon the Commission's opinion.[51]

It is thus our opinion that plaintiffs were mistaken when they concluded they could use a tariff to impose liability upon warehousemen and others who are not designated as consignors or consignees. Clearly those cases which indicate that demurrage may be imposed by a tariff only authorize the imposition of such liability upon those who by the transportation contract in effect become consignors or consignees in their own name. We do not interpret those cases as changing fundamentals of contract or agency law and we are unwilling to attempt to make such change in the law by this opinion. In so concluding we are not unmindful of the fact that motor carriers have an adequate remedy to collect demurrage charges from consignors and consignees and may require them to guarantee the payment of such charges when delay is caused by their agents.[52]

We therefore affirm the order of the Interstate Commerce Commission and dismiss the complaint.[53]

Judgment accordingly.

50. Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962).

51. In view of the disposition we make of the case it is likewise unnecessary to deal with the Commission's finding that the proposed tariff was unclear and indefinite.

52. Carriers and shippers are free to contract regarding the payment of carriers' charg-

es. Louisville & N. R.R. v. Central Iron Co., 265 U.S. 59, 66, 44 S.Ct. 441, 68 L.Ed. 900 (1924).

53. We do not discuss what plaintiffs alleged to be an "order" of the Interstate Commerce Commission issued on October 20, 1969, since the Commission's action was held to be "unlawful" in A. E. Staley Mfg. Co. v. United States, 310 F.Supp. 485, 489 (D.Minn.1970).